ABY HILLER *v.* THE STATE.*

(*Jackson,* April Term, 1932.)

Opinion filed, June 4, 1932.

---

*On homicide as result of misadventure, see 13 R. C. L., 858, 859; R. C. L. Perm. Supp., p. 3428; R. C. L. Pocket Part, title Homicide, sec. 161.

As to homicide by negligent operation of automobile, see annotation in 30 L. R. A. (N. S.), 458; 33 L. R. A. (N. S.) 403; L. R. A., 1918B, 954; 53 A. L. R., 254; 59 A. L. R., 695; 2 R. C. L., 1212.

On driving while intoxicated as act malum in se, see R. C. L., Pocket Part, title Automobiles, sec. 48.

As to appeal to race prejudice, see 2 R. C. L., 426; R. C. L. Perm. Supp., p. 464; R. C. L. Pocket Part, title Arguments of Counsel, sec. 25.

RICE A. PIERCE and ROBERT P. ADAMS, for plaintiff in error.

W. F. BARRY, JR., Assistant Attorney-General, for defendant in error.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

This was a conviction of involuntary manslaughter with a jail sentence of eleven months and twenty-nine days. In a collision between the Chevrolet car of plaintiff in error and the Ford car of J. W. Jonakin, the infant child of Mr. Jonakin and Mrs. Jonakin, being carried in the arms of the mother at the time, met its death. The unfortunate tragic result of the collision naturally tends to render more passionate human judgment in weighing the conduct of the accused.

It must be borne in mind, as said by this Court, in *Copeland* v. *State,* 154 Tenn., 11, in disposing of a charge of criminal liability in a case of automobile accident killing, that "Allowance must always be made for misadventure and accident, as distinguished from culpable negligence;" and that it is uniformly held that the kind of negligence required to impose criminal liability "must be of a higher degree than is required to establish negligence upon a mere civil issue."

The collision occurred in March, 1929, on the crest of a hill on a graveled highway, thirty-five feet wide, some six or seven miles east of the town of Obion, about 1:30 P. M. Mr. Jonakin had left Obion shortly before in his Ford roadster which he was driving. Hiller was a salesman traveling out of New Orleans, about fifty years of age, whose character for truth and veracity is shown to have been excellent. The State's theory is that he was driving at an excessive rate of speed and on his left-hand side of the road; and that Jonakin was driving very slowly on his extreme right-hand side, where he should be. The only eye witnesses to the crash were Jonakin and his wife and Hiller, who puts his speed at about twenty-five miles, and who insists he approached the crest of the hill well over on his right side, and that first seeing Jonakin's car some thirty to thirty-five feet distant as they came over the hill, driving on Jonakin's left, to avoid a head on collision, there being a ditch on his right, he swerved to the left in an effort to pass, and that at the same moment Jonakin, seeing Hiller's car, and realizing that he, Jonakin, was on his wrong side, quickly jerked his car to his right, striking Hiller's car about the right rear fender.

All parties testifying agree that after the collision the cars were in respective positions supporting Hiller's tes-

timony. His car rested on, or against an embankment on the north side of the road, which ran east and west, while Jonakin's car was turned toward the north, headed into the rear of Hiller's car. An apparently intelligent and disinterested witness named Watts, a stranger to all parties who reached the scene shortly after the collision, prepared at the time a plat, or diagram, which is in the record, and which is approved by other witnesses, which not only clearly shows the positions of the cars afterwards, but also indicates clearly the course of both cars as they immediately approached each other. This testimony and drawing made at the time strongly sustains the testimony of Hiller that he was driving up the hill on his extreme right, the south side of the road, but that Jonakin was driving up the hill on his left, the same south side, and that both drivers turned to the north side of the road at about the same time, resulting in the collision.

The theory of the prosecution appears to rest on either (1) reckless negligence, shown by high speed and left-hand side driving, when approaching the crest of a hill, or (2) violation of the thirty mile speed limit statute, repeal of which did not take effect until some thirty days later.

The only evidence that Hiller was exceeding the speed limit at the place of the meeting is that of Mr. and Mrs. Jonakin, who estimate his speed at from fifty to sixty miles an hour. Mr. Jonakin's testimony on this point is unsatisfactory. He makes confusing and contradictory statements as to the distance at which he first saw Hiller's car approaching. In view of the grade of the road established in the record, and the extent of the hill up the opposite sides of which the cars came, it is hardly possible that the occupants of either car could have seen the

other until within a very short distance of each other. And, naturally, startled by seeing suddenly an approaching car threatening a head on collision, anything like an accurate estimate of its speed would be impossible. Moreover, unquestionably Jonakin's attention was directed instantly to the futile effort he made to get his car across the road. We are unable to find any satisfactory or dependable evidence that Hiller was exceeding the speed limit of thirty miles. But if it be conceded that he was exceeding the speed limit, it can hardly be said on this record that this was the proximate cause of the collision. As already indicated, we think the weight of the evidence shows that Mr. Jonakin's car was at the time on his left-hand side, and that this, together with his too late effort to cross over to his right, was the cause of the collision.

The question is not one of contributory negligence on the part of Jonakin—not a defense in a criminal case —but the mere violation of the statute will not sustain a conviction of manslaughter when it appears that the killing was not the natural or probable result of the unlawful act. See *Holder* v. *State,* 152 Tenn., 390, where the authorities are reviewed and the distinction is pointed out between unlawful acts *malum in se,* and those merely *malum prohibitum,* to which driving beyond the speed limit fixed by law belongs. And this distinction was further emphasized in *Keller* v. *State,* 155 Tenn., 633, which classified driving while drunk as an unlawful act *malum in se.*

Nor can it be said that Hiller was guilty of criminal negligence in turning to his left after seeing the other car. If too near together to stop successfully, his movement to the left was certainly not more than an error of judgment. Witness Watts testifies that Jonakin passed him a mile or two out of Obion and that he followed

the Jonakin car to the point of the Collision; that Jonakin's car gradually drew away from him; that he was driving between twenty-five and thirty miles an hour and the Jonakin car somewhat faster, until the cars were from a quarter to a half mile apart when the collision occurred. He says that he observed and was impressed by the fact that Mr. Jonakin drove much of the time on the left, instead of the right side. This Mr. Jonakin denies, but a driver frequently does this unconsciously and inadvertently. And a circumstance tending to explain this and sustain Mr. Watts is that the gravel road, some thirty-five feet wide, was being scraped and had been freshly gone over on the south side, rendering this the more inviting side for driving. But, however this may be, we think the weight of the evidence clearly shows that Mr. Jonakin was crossing from his left to his right, from the south to the north side, when the cars met. Without further reviewing the evidence, we are of opinion that the preponderance of the evidence is against the verdict.

▇ By numerous assignments complaint is made, and we think quite justly, of the injection into the trial by counsel conducting the prosecution, in the absence of the Attorney-General, of the racial issue, the accused being of the Hebrew race. Not only was this done in the course of the examination of witnesses, to such an extent as to call for correction by the trial judge, and to call out from him at one point the statement that, "Now, General, I have told you, a Jew is entitled to the same kind of trial in this Court as a Gentile," to which counsel replied, "Oh, I guess so;" but particularly objectionable language was used by counsel in argument to the jury along this same line. We quote two illustrations:

From the opening argument:

"There came this dare-devil Jew, a speed fiend, a road hog, at sixty miles an hour and ran into the little Ford and slaughtered the fourteen months old child, and his Chevrolet sat on the bank full of shoes, samples and Jew."

From the closing argument:

"Other people have as much right on the roads of Obion County as this Jew from New Orleans, but he is a road hog and says get out of my way, let me by with my new Chevrolet six, a six in the price range of a four. You get out of my way, while I run sixty miles an hour, and if you don't do it, I'm one of God's chosen people; I'll run over you and slaughter your child, and then prove my good character by a crowd of my Jew friends. Gentlemen, a Jew has no more rights on Obion County highways than Mr. Jonakin. I don't want you to be prejudiced against him, because he is a Jew, but you know how they stick together, and the majority of his witnesses in this case are Jews."

The descriptive term "Jew" is not one of opprobrium. Paul proudly proclaimed before a King that he was a Jew. And Disraeli boasted of it before the House of Commons. The race has great names in a great history. But the point is that this trial of a Jew was before a Gentile jury, in a community predominantly Gentile. To emphasize this racial distinction tended naturally to foster racial prejudice. To argue that Jews stand together was to call on Gentiles to do so in antagonism. The case of a Gentile before a Jewish jury would be subject to like prejudicial effect. Therefore, no appeal by the prosecution to racial distinction is permissible.

In *Roland* v. *State,* 137 Tenn., 663, this Court, speaking through our present Chief Justice, strongly condemned the injection of a race issue into the trial of that case, in which a negro was being prosecuted, and the conviction was reversed by this Court on this ground alone. Said the Court, ''An appeal to race prejudice on the part of a sworn officer of the State is inexcusable.'' In that case an Assistant Attorney-General was the offender. When counsel assumes the role of Attorney-General and acts in his place and stead, he should likewise assume that semi-judicial attitude in the prosecution which this Court has repeatedly enjoined upon these highly responsible officers of the Courts of justice.

This case must be reversed, as already indicated, (1) on its facts, and (2) because of this improper and prejudicial argument and conduct of the prosecution, probably induced by too great professional zeal, unrestrained by recognition of official responsibility.