KNIGHT *v.* STATE.

(*Knoxville*, September Term, 1949.)

Opinion filed April 29, 1950.

O. W. McKENZIE, of Dayton, for plaintiff in error.

NAT TIPTON, Asst. Atty. Gen., for the State.

MR. JUSTICE TOMLINSON delivered the opinion of the Court.

While Knight was being held in jail after this case had been appealed he escaped and was gone for a long while. Nevertheless, he was in custody at the time of consideration by this Court of that appeal and, as we understand it, has been in custody for quite a while. The State has made a motion to dismiss the appeal because of the escape and relies upon the case of *Bradford v. State,* 184 Tenn. 694, 202 S. W. (2d) 647.

We think the Bradford case is hardly applicable here. There the defendant was absent when his motion for a new trial came on for hearing. It was accordingly held that his motion would not be considered since no judgment thereon could be enforced at the time, the defendant being a fugitive. In this case the defendant is in custody and the judgment of the Court can be enforced, therefore, without the consent of the defendant. The motion to dismiss the appeal is denied.

This appeal by Knight is from a conviction of murder in the second degree with the maximum punishment fixed

at fifteen years for the killing of John Henry McLemore in January of 1948. Knight admits the homicide, but insists that he acted in self defense, and that the preponderance of the evidence is to that effect.

At the time of this homicide McLemore, the deceased, was living on the side of the mountain with his common-law wife, Thelma Ferry, and his sister, Maggie McLemore. Their house was located some two hundred or more feet from the highway. Knight, the plaintiff in error, lived with his aunt, Laura Johnson, and a cousin, Vavadea Blaylock, in a house on the other side of this highway in sight and calling distance of the McLemore house. Knight's house was very close to the highway and was separated from it by a fence. A foot path led from the McLemore house to the highway in front of the Knight house. Knight was standing just outside the gate in this fence when he fired with his shotgun loaded with buckshot at McLemore as the latter was proceeding along this path towards Knight. McLemore had not crossed the highway and was 84 feet from Knight when the shot was fired.

No particular antagonism towards each other seems to have ever been exhibited by these two men until about thirty minutes prior to the fatal encounter when a difficulty between them occurred at a filling station about a mile from their homes. Knight and his aunt, Mrs. Laura Johnson, had stopped at this filling station to get gas. While the car was being so serviced, McLemore drove up in company with Mr. and Mrs. Beecher Angel. He was partially intoxicated. He told Knight that he wanted to talk with him. When Knight got out of the car McLemore said that McLemore's sister, Maggie, had informed him that Knight had called him a very insult-

ing name. Knight's denial was not satisfactory to him. He had it in his mind to give Knight a whipping then and there. As he advanced upon Knight the latter pulled his knife and warned him to stop. McLemore did stop and got in his car with the statement that he "would go home and get his shotgun and kill Knight". Mrs. Beecher Angel testified that he repeated his threat on the way home. Immediately upon arrival at his home McLemore got his shotgun, loaded it, and put it in the corner of the room. Angel testifies that at this time he remarked that he would kill Knight "if he messed with him".

The threat of McLemore at the filling station to get his gun and kill Knight undoubtedly gave Knight serious concern. He procured a taxicab and with his aunt, Mrs. Johnson, went to his home, procured his shotgun, took it back with him in the taxicab to the filling station where he then got his own car and drove to his home, leaving Mrs. Johnson at the filling station. She arrived at the home a few minutes later in a taxicab. Knight says that he used a taxicab to get his gun because he felt there was less likelihood of being recognized and waylaid by McLemore. Just why Mrs. Johnson went with him in the taxi for the gun but did not return with him in his own car is not at all clear. The inference is that she was afraid to ride in his car because of the threat which McLemore had made at the filling station.

The fatal encounter occurred within a few minutes after Knight arrived home and before he entered the house. Mr. and Mrs. Angel, Thelma Ferry and Maggie McLemore were all in the McLemore house when Knight reached his home. All of them with the exception of Mrs. Angel testify that about that time some man called

McLemore. Angel said the statement was "come down here". Thelma Ferry says that he called three times saying "Hey, John, come down here and bring old Maggie with you". Knight denies that he called McLemore, but a conclusion to the contrary is inescapable under this record.

When McLemore heard Knight call, he picked up his shotgun and started out. His sister, his wife, Mr. and Mrs. Angel urged McLemore not to leave the house. He ignored their advice, proceeded down the aforesaid path towards Knight until he reached the point where his car was parked. He placed his shotgun on the running board of this car and then continued on towards Knight.

The view from Knight's yard to the McLemore house is obstructed at places and there is no evidence that Knight ever saw McLemore's shotgun. Therefore, if McLemore's conduct with reference to the disposition of this gun may be regarded as a gesture to indicate an abandonment of evil intentions, it was, nevertheless, a gesture of which Knight was not aware.

All of the evidence is that as McLemore proceeded on towards Knight he had his hands in his pockets. Knight says that he observed the location of McLemore's hands and thought that he was armed with a pistol. No pistol was found in his pocket.

Plaintiff in error Knight, testified that as McLemore thus approached he said to Knight "Lets cut it out", then said "lets shoot it out", and "kept coming down the path". He is corroborated in this statement by his kinswoman, Vavadea Blaylock, who says that as McLemore approached he told Knight "to come across the road, and they would cut it out. Sid (Knight) said he wouldn't,

then John (McLemore) said 'Well, we will shoot it out' ".

Laura Johnson, the aunt of plaintiff in error, Knight, was in the Knight yard. She frantically but unsuccessfully begged McLemore to stop. Knight says that he twice directed McLemore to stop but that when he took the gun down McLemore again started towards him, that he again warned him to stop, but McLemore continued to advance and he fired. Beecher Angel, a witness called by the State, testified that as McLemore approached, Knight said to him "John stop, Don't come any closer", and further said "John stop or I will kill you", but that McLemore "kept on coming".

We refrain from an expression of any opinion as to the proper conclusion of fact which should be reached upon the foregoing evidence since this case must be reversed and remanded for the reason hereinafter stated. That evidence has been narrated because it created what one, some or all of the jurors reasonably might or could have regarded as a close question of fact as between the respective theories of the State and of the defendant; and, therefore, demonstrates the reason why it is necessary to reverse the judgment of the lower Court because of the hereinafter stated error.

The bill of exceptions discloses the following occurrence during the presentation of arguments to the jury.

"In the course of the argument by the Attorney General, he made the following remark:

" 'Gentlemen of the Jury:

" 'This man has been convicted of larceny, and he is not worthy of belief, and he could not testify in this case was he not the defendant, but that still does not make him worthy of belief. He is infamous. The de-

fendant has also shot his uncle, Tom Simmons and a Smith, cut up his brother-in-law, and his wife has taken out a peace-warrant for him. *A man of such character, and one who has been guilty of such crimes should be convicted on general principles and it is your duty, Gentlemen of the Jury, to convict him for the good of society.* Tom Simmons was his own flesh and blood, and he was not justified under any circumstances in shooting him.'

"Counsel for the defendant duly excepted, but there was no ruling on the exception by the Court." (Emphasis supplied.)

The refusal of the trial court to grant a new trial on this ground is assigned as error.

██ It is to be noted that the District Attorney said to the jury that one who has been guilty of such crimes *"should be convicted on general principles, and it is your duty, Gentlemen of the jury, to convict him for the good of society."* Of course, this was not legitimate argument and was thoroughly unsound as a matter of law. No doubt it was inadvertently said by the District Attorney in the zeal and in the heat of argument, but nevertheless the District Attorney General is "a quasi judicial officer, representing the people of the State, and presumed to act impartially in the interest only of justice". *Watkins* v. *State,* 140 Tenn. 1, 10, 203 S. W. 344. For this reason, as known by every experienced criminal trial lawyer, his statements "especially in concluding arguments, often have great weight with juries". *Turner* v. *State,* 72 Tenn. 206, 210.

██ The failure of the trial court to rule upon the timely objection of defendant's counsel to this improper argument was in effect an overruling of the exception.

*Roland* v. *State*, 137 Tenn. 663, 666, 194 S. W. 1097.

As heretofore observed the evidence presented what one, some, or all of the jurors reasonably might or could have regarded as a close question of fact between the opposing theories of the State and of the defendant. In this situation, and notwithstanding the objection of the defendant, the jury was told by a semi-judicial officer in whom it had a right to have great confidence that it was the duty of that jury to convict Knight on general principles and for the good of society of the crime with which he was charged and for which he was on trial in this particular case, because he had been guilty of other crimes than the one for which he was being tried, and the jury entered into consideration of its verdict with no correction of that damaging and erroneous statement made to it on high authority, the District Attorney General. This being the situation, we think the Trial Judge made a mistake in not sustaining this ground of the motion for a new trial and that now this Court, in accordance with its previous holdings in cases where such arguments were prejudicial, must reverse and remand. Compare *Turner* v. *State*, 4 Lea, 206, 72 Tenn. 207; *Roland* v. *State*, 137 Tenn. 663, 194 S. W. 1097; *Watkins* v. *State*, 140 Tenn. 1, 203 S. W. 344; *Pearson* v. *State*, 143 Tenn. 385, 226 S. W. 538; *Hiller* v. *State*, 164 Tenn. 388, 50 S. W. (2d) 225.

All concur.