Audrey Mildred Roe

*v.*

State of Tennessee.

358 S.W.2d 308.

(*Nashville,* December Term, 1961.)

Opinion filed June 5, 1962.

JOHN M. HEISKELL, Memphis, MONTEDONICO, BOONE, GILLILAND, HEISKELL & LOCH, Memphis, of counsel, for plaintiff in error.

GEORGE F. McCANLESS, Attorney General, THOMAS E. Fox, Assistant Attorney General, Nashville, for the State.

MR. JUSTICE FELTS delivered the opinion of the Court.

Plaintiff in error, Mrs. Roe, was indicted for murder in the second degree of her husband, Frank Roe, "with an automobile." She was acquitted of murder, but convicted of the lesser included offense of involuntary manslaughter and her punishment fixed by the jury at 9 months in the county workhouse.

She appealed in error and has assigned errors insisting that there is no credible evidence to support the verdict; that the evidence preponderates against the verdict of guilt and in favor of her innocence; and that the verdict is based wholly upon circumstantial evidence totally inadequate to permit a finding of guilt.

It is true upon this record the issues as to the cause of death and of criminal agency are involved in some difficulty and doubt. It appears there was no eyewitness to the occurrence except perhaps Mrs. Roe, and she did not testify on the trial. Evidence for the State consisted of proof of prior extrajudicial statements she had made and of collateral facts and circumstances tending to contradict her and to support the State's theory of guilt. No evidence was offered for the defense.

The fatal injury to the deceased occurred shortly after midnight Saturday night February 21, 1959, on the Winchester pike near its intersection with the old Airways Boulevard, in front of or near the Airways Club and shortly after Mr. and Mrs. Roe had left the club, where they had spent some two hours. He had been drinking intoxicating liquor for a day or so and appears to have been pretty drunk, or, in defendant's words, he had "had a little too much," but was able to walk with her out of the club to their car.

Mr. and Mrs. Roe left the club together about 12:20 or 12:30 A.M. (Feb. 22). It seems he was not then quite ready or willing to leave. She stated that when she first asked him to go, "he didn't act like he wanted to go"; that he fell out of his chair, she helped him up; and that he then said "he was ready to go." Some ten minutes (the proof

is not exact as to the time) after they left the club, he was found lying in the highway, seriously injured.

When found, he was unable to speak, unconscious, and bleeding profusely at the mouth and nose. He was lying in the north half (westbound traffic lane) of Winchester pike some 60 feet west of the entrance to the pike from the Airways Club parking lot. He was lying cross-ways of the road, his head pointing toward the center, and his feet toward the north margin of the paved surface. His shoes were covered with mud and his clothes spattered with mud.

The first person to find him was the witness Richardson. Richardson had entered the Winchester pike some distance west of the club and was driving his car east. He did not recall having met any other car after entering the pike. As he neared the club, he saw the man lying in the road. He stopped his car on the shoulder of the road, and flagged a pickup truck approaching from the other direction (coming west) and had its driver shine its lights on the man, and soon a crowd gathered there.

A few minutes later, defendant Mrs. Roe, driving east on Winchester pike, returned to the scene, parked her car on her right or the south shoulder of the road, went to the injured man, and took him by the arm. Someone suggested that he was badly hurt and should not be moved. Then Mrs. Roe went to the front door of the club and told Mrs. Rhodes, an employee there, that ''her husband fell out of the car and another car ran over him,'' and she asked that an ambulance be called.

A few minutes later, the ambulance came, Mrs. Roe handed her car keys to Mrs. Rhodes' husband, asked him to park her car for her, and got into the ambulance and

accompanied her husband to the Baptist Hospital. He was still living, but bleeding profusely from the nose and mouth. His injuries were such that the doctors could not stop the bleeding, and he died at 2:10 A.M. (Feb. 22), the immediate cause of death being strangulation in his own blood.

The sheriff's office was also called and received the call at 12:43 A.M. (Feb. 22). About 15 minutes later, two members of the sheriff's force, witness Jones and his partner, arrived at the scene. As they were arriving; they met the ambulance taking Roe to the hospital. Jones saw the blood spot where Roe had been lying. This spot was on the north half of the paved surface or westbound traffic lane, and was 63 feet west of the point where the driveway from the Airways Club parking lot enters Winchester pike.

This parking area was paved but at its edges and at the entrance of the driveway into Winchester pike the area was gravelled with reddish, sandy, brown gravel. It had been raining that night, but had stopped, and there was a big mudhole in or near this driveway some 5 or 6 feet from the north edge of the paved part of Winchester pike. This mudhole was partly filled with water and there was sandy, brown mud along the edge of the driveway and parking lot; but there was no mud on the shoulders of Winchester pike between this driveway entrance and the point where Roe's body was found. These conditions were shown by photographs sent up (Exs. 5, 6, 7 and 8 to Jones).

Mr. Rhodes turned over to Jones the keys to the Roe car. Jones found that all the car's doors were locked except the left front door where the driver got out. The

right front door glass and the right vent glass were pushed or bent in and severely cracked, shattered like a spider web; and there were small slivers or pieces of glass on the right front seat and floorboard, which appeared to have fallen there and not to have been in anywise disturbed. There was no sign of any mud inside the car.

On the outside of the car, however, there was sandy, brown mud of the same type as that of the mudholes and the gravel in the driveway. This mud was on the right side of the car, on the right rear tire, the side of the running board, and both of the right doors. On the door beneath and a little to the rear of the right door handle, there were smears of brown mud which appeared to be human footprints. The witness Jones examined the car at the scene and noted these conditions.

Jones then had the car towed in to Mustin's Body Shop to be stored inside until photographs could be made of it showing the conditions as to the broken glass, the slivers on the inside, and the smears of mud on the right side of the car below and somewhat to the rear of the door handles. Such photographs were made and are sent up with the record (Exs. 1, 2, 3 and 4 to Jones). Also, the shoes and clothes of deceased were sent up as exhibits.

The medical evidence tended to prove that the profuse bleeding, the immediate cause of death, was produced by physical trauma or violent physical injury—extensive fractures of the bones of the face, jaw and head, cutting the soft tissue and major blood vessels at the base of the brain behind the nose and throat; and the autopsy stated, as part of the clinical history, that:

"The decedent, a 47 year old, white male was allegedly intoxicated and apparently while attempting to get

into a car was thrown backward from the car striking his head on the pavement as the car suddenly accelerated.''

The autopsy further stated the final pathological diagnosis to be: ''I. Multiple Skull Fractures, A. Aspiration of Blood, Pulmonary, B. Pulmonary Edema and Congestion, C. Cerebral Laceration, Severe; II. Fractures, Ribs 8 and 9, Right Anterior Auxillary; III. Acute Ethyl Alcoholism—Postmortem Blood Level 0.32%, A. Fatty Liver; IV. Contusions, Body Surfaces, Old and Recent.''

As stated, deceased died at 2:10 A.M. February 22, 1959. Later that same day, defendant Mrs. Roe, with counsel then representing her, went to the sheriff's office and underwent a very full interrogation by Captain Hathcock, which was typewritten, signed by her, and witnessed by him. This statement was introduced by the State as an exhibit to Hathcock's testimony, is sent up with the record, and consists of 7 pages.

The witness Hathcock began his questioning of Mrs. Roe by stating to her that they were investigating the death of her husband, and that all indications were that her husband ''was apparently struck or run over by an automobile''; and he asked her to detail what had occurred the night of February 21 and the next morning. She stated:

''We got out there [Airways Club] somewhere around 10 o'clock and stayed until 12 o'clock and we left and we went, my husband and I, went to the car and I was driving. I pulled out and went close to 20 feet and he either opened the door or hit the handle and fell out of the car. And, I went on up there about 500 ft. and turned around and came back down to where he was

laying. They was five or six men hanging around there. They was in front of a truck and my husband was laying in the traffic lane about five feet in front of the truck. One of the ladies that works at the Airways Club came out there where he was laying and I went back in the kitchen of the Airways Club and waited until the ambulance got there. There was a man that came in there and told me the ambulance was there and I went on out and I handed one of the men that works at the Airways Club my keys, I don't know which one it was, then I got in the ambulance and went to the hospital. I stayed at the hospital until after he passed away.''

She further said that as she and her husband left the club, they walked out together to the car; that he did not step in any mud; that she got in the car on the left side and he on the right side; that as she drove out to the Winchester pike, she did not drive through any mud, but stayed ''on the blacktop all the time.'' She made no attempt to account for the mud on the deceased's shoes and clothes and on the outside of the car.

She also said as she ''pulled off the parking lot,'' he said ''I think I'll go back,'' and by the time she had driven about 20 feet on the pike, the car door came open and he fell or jumped out; that she ''couldn't have been going over 25'' miles per hour; and that she did not stop to see whether he was hurt. Though she does deny that she felt any bump as if the car ran over him. It seems highly significant that she did not stop. She was asked about this:

''Q. After your husband went out the door of your car, why did you keep driving?

"A. I thought once I would go on home and I thought then I might as well go get him because he would wind up in jail and I would have to pay him out.

"Q. Didn't it occur to you that a man falling or jumping out of a moving automobile of about 25 miles per hour, might have hurt himself?

"A. I didn't think about whether it would hurt him or not."

She made no attempt to explain what had caused the right front door glass and vent glass to be shattered, and its broken pieces on the seat and floorboard. She merely said she never noticed it; nor did she account for the fact that the right front door which she claimed had come open and let her husband fall out, was found to be locked by the officer examining the car a few minutes after the accident.

█ It was for the jury to weight her statements along with the testimony of the State's witnesses; and the jury's verdict indicates they rejected the former and accepted the latter. So, taking the basic facts and circumstances, as evidenced by the State's proof, to be true, the question for the jury was whether such facts and circumstances were sufficient in point of reason and law to warrant a conclusion by them that defendant was guilty of involuntary manslaughter.

The State's theory was that the deceased was at the club drunk and Mrs. Roe wanted him to go home; that when he went out to the car with her, he wanted to go back, she became disgusted, decided to leave him, and locked him out of the car; that he shattered the glass of the right front door and vent with his fists; that as she

started to drive off, he grabbed hold of the door handles and while he was thus holding, she drove the car and dragged him through the mudhole onto the pike; that, as he kept holding on with his muddy feet against the side of the car, she speeded up so that he either fell or one of his feet was caught by the right rear wheel, and he was dragged under it.

We think this theory is supported by the facts and circumstances proven. It seems reasonable and highly probable that Roe's conduct (his drunken condition and his desire to "go back") disgusted Mrs. Roe, she decided to drive off and leave him, shut and locked the car doors, and that this caused him to shatter the door and vent glass with his fists. No other explanation of the shattered glass and the broken pieces on the front seat and floorboard has been suggested by defendant or her able counsel; nor can we think of any.

The circumstance of the shattered glass takes on added significance when taken with the other circumstances; the mud on Roe's shoes and clothes and on the outside of the car, and the nature of his injuries. Some ten minutes before, in the club, his clothes were tidy and there was no mud on them. It seems a just inference that this mud must have gotten on his shoes and clothes and the car as he, holding on to its handles, was dragged through the mudhole as she drove out to the paved surface of the pike, for there was no mud on the pike's surface or its shoulders from where she drove out to where his body was found.

This inference is strengthened by the fact that his shoes were not only covered with mud, but the soles were "ground" or "scratched" as if they had been dragged, and the fact that near the bottom of the car doors there

were muddy smears having the appearance of a man's footprints, as if he had put his muddy feet against the side of the car (Ex. 3 to Jones). And his wounds were such as would have been caused if the car had suddenly speeded up and he was either thrown violently to the pavement, or one of his feet caught by the rear wheel and his body run over.

Able counsel for Mrs. Roe, however, insists that this mode of reasoning amounts to parlaying the facts and circumstances and ''stacking inference on inference''; that the argument is that the car's glass was broken from the outside because Roe was outside trying to get in; that he was outside trying to get in because the glass was broken; that he was holding the door handles because he was dragged in the mud; and he was dragged in the mud because he was holding to the handles; and that this is a classic example of ''circular argument.''

Courts have often responded to this sort of objection to the use of circumstantial evidence, and have pointed out that ''a fact may be inferred from circumstantial evidence and such fact may be the basis of a further inference to the ultimate or sought for fact.'' *Good v. Tennessee Coach Co.*, 30 Tenn.App. 575, 582-583, 209 S.W. 2d 41, 45, and cases there cited.

Nowhere has such objection been better answered than in *Grant v. Australian Knitting Mills, Ltd.*, 1936 A.C. 85, 96. That was an action by a user of underwear against the manufacturer for negligently leaving an excess of ''free sulphites'' in the garment, which caused plaintiff to have ''dermatitis.'' Delivering the judgment of the House of Lords, Privy Council, Lord Wright said:

"Mr. Greene, for the respondents quite rightly emphasized how crucial it would have been for the appellant's case to prove, by positive evidence, that in fact the garments which the appellant wore contained an excess of free sulphites. He contended that the appellant's case involved arguing in a circle; his argument, he said, was that the garments must have caused the dermititis because they contained excess sulphites, and must have contained excess sulphites because they caused the disease; but nought, he said, added to nought still is no more than nought.

"This, however, does not do justice either to the process of reasoning by way of probable inference which has to do so much in human affairs, or to the nature of circumstantial evidence in law courts. Mathematical, or strict logical, demonstration is generally impossible: juries are in practice told that they must act on such reasonable balance of probabilities as would suffice to determine a reasonable man to take a decision in the grave affairs of life. Pieces of evidence, each by itself insufficient, may together constitute a significant whole, and justify by their combined effect a conclusion."

■ True, this was said in a civil case, but the same mode of reasoning applies in a criminal case, the only difference being the greater degree of certainty required in the latter: that in the former a mere preponderance of probability suffices, while in the latter guilt must be proved beyond a reasonable doubt. *Farmer v. State*, 208 Tenn. 75, 78-79, 343 S.W.2d 895.

■ Though this case has involved difficulty, nevertheless, upon full consideration, we conclude, for the reasons

above indicated, that the circumstances proved were not only consistent with the accused's guilt, but excluded every other reasonable hypothesis than that of guilt, and the jury could properly find guilt beyond a reasonable doubt; and we cannot say that the evidence preponderates against the verdict. Cf. *Lancaster v. The State,* 91 Tenn. 267, 18 S.W. 777; *Marable v. State,* 203 Tenn. 440, 451-452, 313 S.W.2d 451.

For defendant, it is insisted, however, that taking all of the circumstances in proof by the State as true, with all legitimate inferences therefrom, they are, nevertheless, legally insufficient to make out a case of involuntary manslaughter against defendant — insufficient to bring this within any of the three classes of our cases in which convictions for homicide have been upheld in automobile accidents:

(1) That there was no proof that defendant had taken any intoxicant or was driving the car under the influence of an intoxicant, so as to make her guilty of an act *malum in se,* which supplies the criminal intent. *Keller v. State,* 155 Tenn. 633, 634, 299 S.W. 803, 59 A.L.R. 685; *Rogers v. State,* 196 Tenn. 263, 265 S.W.2d 559; *Eager v. State,* 205 Tenn. 156, 325 S.W.2d 815.

(2) That there was no proof that she was violating any traffic regulation, such as speeding, driving on the wrong side of the road, or reckless driving, which are ordinarily acts merely *malum prohibitum* and make out unlawful homicide if they are the proximate cause of death. *Copeland v. State,* 154 Tenn. 7, 10, 285 S.W. 565, 49 A.L.R. 605; *Hiller v. State,* 164 Tenn. 388, 50 S.W.2d 225; *Weaver v. State,* 185 Tenn. 276, 279, 206 S.W.2d 293.

■ That there was no proof that defendant was guilty of any gross or culpable negligence, or of any criminal want or caution or circumspection, causing the death charged; and that there was no proof that the death was not the result of misadventure or pure accident. *Copeland v. State,* supra; *Hiller v. State,* supra; *Weaver v. State,* supra.

■ Where one unintentionally causes another's death by conduct not amounting to a felony and not *malum in se,* but which constitutes gross and culpable negligence, he is guilty of involuntary manslaughter. *Copeland v. State,* supra, 154 Tenn. 10, 285 S.W. 565; 1 Anderson's Wharton's Criminal Law and Procedure (12th ed.), sec. 289; *Lee v. State,* 41 Tenn. 62, 67.

It is true in such cases allowance must be made for misadventure or accident, as distinguished from culpable negligence; and that, to support a conviction of crime, the accused must have been guilty of a higher and grosser degree of negligence than that which merely suffices to support a judgment in a civil case. *Hiller v. State,* supra, 164 Tenn. 390, 50 S.W.2d 225; *Weaver v. State,* supra, 185 Tenn. 278, 279, 206 S.W.2d 293.

■ To convict a motorist of homicide by negligence, it is, of course, not enough to prove that he was guilty merely of a want of due care, inadvertence, or inattention, but it must be shown that his negligence in driving was such that he knew or reasonably should have known that it might endanger human life, and that the death charged was the natural and probable result of such negligence. *Weaver v. State,* supra, 185 Tenn. 278, 279, 206 S.W.2d 293; 3 Anderson's Wharton's Criminal Law and Procedure (12th ed.), sec. 976.

Upon the circumstances of this case, we think the jury could have reasonably found that deceased was drunk and disagreeable, and defendant locked him out of the car and started to drive off and leave him, while he was swinging on the door handles alternately dragging his feet and putting them against the side of the car; and that she speeded up the car and thus caused him either to be violently thrown to the pavement, or to be run over by the car.

We also think the jury could well have found that defendant knew, or reasonably should have known, that her speeding up the car, in these circumstances, might endanger his life; that her conduct in doing so constituted culpable, criminal negligence; that his death was the natural and probable consequence of such negligence; and that she, therefore, was guilty of involuntary manslaughter.

All of the assignments of error are overruled and the judgment of the Trial Court is affirmed.