**STATE of Tennessee, Petitioner,**

v.

**Don JOHNSON, Respondent.**

Supreme Court of Tennessee.

Sept. 27, 1976.

Tom P. Jennings, Asst. Atty. Gen., Nashville, for petitioner; R. A. Ashley, Atty. Gen., Nashville, of counsel.

J. Randall Shelton, Morristown, for respondent.

## OPINION

BROCK, Justice.

### I

This is a homicide case arising out of a collision between an automobile operated by the defendant, Don Johnson, and another occupied by the decedents, the Bullion family, a young man, his wife, and their young son. The collision occurred on U.S. 11E in Hamblen County when the right front of the defendant's vehicle struck the left rear of the decedents' vehicle causing it to go out of control, leave the pavement and knock over some gasoline pumps in front of a roadside combination grocery store and service station, overturn and burst into flames, resulting in the death of the three members of the Bullion family. The de-

fendant was convicted of murder in the second degree and sentenced to a term of not less than 10 nor more than 10 years imprisonment. He appealed to the Court of Criminal Appeals which reversed his conviction upon the ground that the evidence preponderated against the finding of the jury that the defendant had acted with malice, express or implied. That court remanded the case to the trial court for a new trial but recommended that the indictment be dismissed unless the State could present new evidence. The State petitioned this Court for certiorari review which was granted.

### II

Before analyzing the evidence to determine whether or not it preponderates against the finding of the jury upon the issue of malice, as found by the Court of Criminal Appeals, we once again look at the criterion by which a defendant's conduct is to be measured when his operation of an automobile is alleged to have been the means whereby the crime of murder was committed. Malice, either express or implied, is an essential ingredient of the crime of second degree murder in this State. T.C.A. §§ 39–2401—39–2403. While some cases have arisen in which the prosecution was able to show a deliberate intent and express malice by the accused to kill the victim by running him down with an automobile, 21 A.L.R.3d 116, Annot.: Murder—Homicide by Automobile, § 12, the more common cases, and the ones which present most of the difficulty, have involved situations in which the requisite malice had to be implied from the surrounding circumstances.

■ The rule of implied malice, which is still followed by this State, was defined long ago in *Tarvers v. State*, 90 Tenn. 45, 16 S.W. 1041 (1891), in which this Court stated that an unintentional killing constitutes murder in the second degree, if the death results from a consciously unlawful act done intentionally and with knowledge on the part of the accused that the act was directly perilous to human life. This rule

has been applied in a number of cases in which convictions for second degree murder have been sustained and wherein death was the result of the operation of an automobile by the accused. *Edwards v. State*, 202 Tenn. 393, 304 S.W.2d 500 (1957); *Eager v. State*, 205 Tenn. 156, 325 S.W.2d 815 (1959); *Staggs v. State*, 210 Tenn. 175, 357 S.W.2d 52 (1962). In each of these cases, one of the facts established by the State was that the defendant operated the automobile while in an intoxicated condition. But, the rule was also applied in *Stallard v. State*, 209 Tenn. 313, 348 S.W.2d 489 (1961), in which intoxication of the driver was not an element but the proof showed that the defendant drove an automobile at an excessive rate of speed on the wrong side of a two-lane road at the crest of a hill while engaged in a race with another automobile, thereby colliding head-on with a car approaching from the opposite direction causing death to its occupants. In the *Stallard* case this Court said:

> "The driving of these automobiles at this point, and at the speed mentioned was an unlawful act. 'And the doing of it was directly perilous to human life'. These young men necessarily knew that. In that situation 'there is implied (to them) such a high degree of conscious and willful recklessness as to amount to that malignity of heart constituting malice'. An unintentional killing under such circumstances is murder in the second degree. *Tarvers v. State, supra; Owen v. State*, 188 Tenn. 479, 468–469, 221 S.W.2d 515.

> "No further discussion as to Stallard, who was driving the automobile that collided with the Dampier automobile, is necessary. He is clearly guilty of murder in the second degree."

Such is the rule of implied malice sufficient to establish murder in the second degree. We consider it also relevant to keep in mind the rule for determining whether or not a defendant's operation of an automobile, which brings death to another, amounts to the crime of involuntary manslaughter. This rule was recently stated for this Court by Mr. Justice Harbison, then acting as a Special Justice, in *Crawley v. State*, 219 Tenn. 707, 413 S.W.2d 370, 372 (1967), as follows:

> "This Court has stated several times that:

> "Where one unintentionally causes another's death by conduct not amounting to felony and not *malum in se* but which constitutes gross and culpable negligence, he is guilty of involuntary manslaughter. * * * It is true in such cases allowance must be made for misadventure or accident, as distinguished from culpable negligence; and that, to support a conviction of crime, the accused must have been guilty of a higher and grosser degree of negligence than that which merely suffices to support a judgment in a civil case. *Roe v. State*, 210 Tenn. 282, 295, 358 S.W.2d 308 (1962), and cases cited therein.

> "In the *Roe* case the Court said:

> " 'To convict a motorist of homicide by negligence, it is, of course, not enough to prove that he was guilty merely of a want of due care, inadvertence, or inattention, but it must be shown that his negligence in driving was such that he knew or reasonably should have known that it might endanger human life, and that the death charged was the natural and probable result of such negligence. *Roe v. State, supra*, at 295, 358 S.W.2d 308. See also, *Newby v. State*, 215 Tenn. 609, 388 S.W.2d 136 (1965).' "

### III

The defendant was the only eyewitness to the collision, so that, the evidence introduced by the State was all circumstantial in nature. Hal Reid Noe, a State highway patrolman of 43½ years experience, arrived upon the scene of the collision shortly after it occurred. His testimony and photographs introduced by him established that the collision occurred on the Andrew Johnson Highway, U.S. 11E at a point west of Morristown and east of Jefferson City. The highway consisted of four lanes, two for west bound traffic and two for east bound traffic, separated by a sizable median strip. Officer Noe found debris, appar-

ently from the collision, located about the middle of the right hand or outside lane of that part of the highway used for west bound traffic at a point almost directly opposite its intersection with a side road called Lakeshore Drive. The white 1964 model Ford automobile—which the defendant had driven—was found approximately 30 ft. west of the debris sitting diagonally in the left hand lane for west bound traffic with its front wheels at approximately the edge of the median strip and the rear wheels back toward the debris and nearer to the line which separates the right and left hand lanes for west bound traffic. He found a '64 model Chevrolet automobile lying on its top slightly west of some gasoline pumps in front of Perky's store a few feet off the north side of the highway and west of Lakeshore Drive. The Chevrolet had knocked over the gasoline pumps, and, the gasoline, the Chevrolet and its three occupants were burning. Darrell Bullion, his wife Sue, and his infant son Michael all perished in the fire before rescue could be made. It was apparent that the fire resulted from the collision.

The defendant's vehicle was found to be damaged on the right front portion thereof, including the fender, bumper, grill and headlight. The Chevrolet bore damage to the left rear corner thereof, indicating that the right front corner of the Ford and the left rear corner of the Chevrolet had come together in the collision. Officer Noe found some markings on the pavement which he considered to be skid marks and which began in the right hand lane for west bound traffic at a point approximately 160 ft. east of where the debris was found, continuing in that lane to the debris, which as indicated above, was in the middle of said lane, and then veering from the debris to the left a little more than 30 ft. to the front end of the defendant's vehicle. Officer Noe said that the marks in question bore slightly to the right from the point of beginning to the point of the debris.

Jack Flemon, a police officer for the City of Morristown, testified that at about 5:30 p. m. on the day of the accident, he was traveling in a westwardly direction on U.S. Highway 11E at a point just west of Morristown when he saw ahead of him a white Ford automobile proceeding in a westwardly direction at a rate of about 45 miles per hour and the brakes of which were alternately being applied and released frequently in an unusual manner, so that, the officer took down the license number from the vehicle which, after the collision in question, he compared to the number on the license plate on the defendant's vehicle, and found them to be the same.

The principal witness for the State was James W. May, a young man who lived in the vicinity of the collision. He testified that he was driving his automobile in a westwardly direction along the Andrew Johnson highway and as he reached the Alpha School, which is located about two miles east of the scene of the collision, ". . . there was a lot of racket all at once passed me like that, and I looked up, and there was two cars, one of them behind the other one." He further testified:

"Q. All right, Sir. Would you describe . . . what did you recognize or note the name and model and color of the first vehicle that passed you?

"A. I think one of them was red and one of them was white.

"Q. Did you notice which one was which or the manufacturing company's name?

"A. No, I didn't pay no attention. The white one was a Ford.

"Q. Was it in front or behind?

"A. It was behind.

"Q. . . . how close were they to each other when they passed?

"A. They were almost glued together, not over two feet apart.

"Q. Not over two feet?

"A. Yes, Sir."

He testified that he saw a man and woman in the front car and one man in the white Ford. He was then asked:

"Q. Could you estimate the speed of the vehicles at the time they passed you?

"A. . . . I was going around 70 when they passed me, and I've speeded several times to keep up with these motorbikes to see how fast they are going too, you know, so I just raced mine on down there to see how fast they was going. I got up past 90, and I still hadn't—to catch them.

\* \* \* \* \* \*

"Q. You got up to 90 miles per hour trying to catch them?

"A. Just past 90, yes sir.

\* \* \* \* \* \*

"A. Well, now I was fairly close behind them, but I couldn't—as you go down through that dip there in front of the big house at Arrow Hills there is a lot of trees there, so I just missed the side (sight?) of the car. I was back here coming down the hill, and they was going up the other side, so I saw them leaving the hollow like that and then the car was out of my sight on account of the trees and then I saw smoke just rolling like that.

"Q. Was it a matter of seconds?

"A. Just seconds, like that.

"Q. How long was it from the time you saw the smoke go up until you arrived at the store, Carroll's store?

"A. I was going pretty fast. I had to slow up then, but, oh, I'd say 2 or 3 seconds.

"Q. And at the time you saw these vehicles going up this hollow and up the hill, how close was the white Ford to the red automobile that was in front to your best estimate?

"A. They had to be against one another almost.

"Q. From the time that they passed you at Alpha School until you arrived at the store, do you have any idea how long it took to travel that two miles or so?

"A. No. I'm not good at guessing time much, but I would say not over four minutes."

He testified that when he arrived on the scene of the collision he saw oil cans, which had been overturned by the Chevrolet, still spinning around on the pavement of the highway and he saw the defendant there on the pavement kicking cans off onto the shoulder. On cross-examination this witness again estimated the speed of the Ford and Chevrolet automobiles which passed him as being in excess of 90 miles per hour:

"A. Well, they'd have to be going close to a 100 because I got up to 90.

"Q. And it's just a little ways from that point where it went out of your sight to Perky's store. Is that correct?

"A. Yes."

The testimony of this witness indicated that he had more than the usual interest in automobiles. Thus, he testified that he often gave chase to motorbikes traveling at high rates of speed because he was curious to ascertain their speed in order that he might warn his son who owned and operated a motorbike. He also revealed that he had been charged twice by the highway patrol for speeding on the highway and had received several other warnings for similar conduct. He also stated that he carried two fire extinguishers under the hood of his automobile and that upon arriving upon the scene of the accident in question he used these extinguishers in an effort to attempt to put out the fire which engulfed the Chevrolet and its occupants. The defendant made no serious attempt to impeach witness May who, from all that appears in the record, was disinterested in the outcome of the case.

Alvin Boley, a young man who came upon the scene of the collision shortly after it occurred, testified that while sitting in his automobile with his wife near the scene he was approached by the defendant who came down a bank beside the highway and asked the witness to take him to Jefferson City, a few miles west of the scene of the collision, to the home of a deputy sheriff, Paul Moore. The defendant is a black man and deputy Moore also is black. Boley complied with this request and transported the de-

fendant to the home of Deputy Moore where the defendant surrendered to Moore.

The only evidence offered by the defendant was his own testimony. He stated that he is 33 years of age, lives in Knoxville, is married and is the father of eight children. He is employed at the American Enka Manufacturing plant located near Morristown and ordinarily rides a bus to and from work, since his driver's license had been revoked. However, on the date in question, he drove a 1964 white Ford automobile which belonged to his wife. He stated that this was the first time he had driven this automobile and that en route from Knoxville to Morristown he noticed that the brakes were defective, in that, when applied they pulled to the right and, also, that it was necessary to pump the pedal in order to achieve braking power. He said he was so concerned with the defective condition of the brakes that when he arrived at Morristown he looked for a mechanic, a friend of his, to repair them, and did not go to work. He stated that as he tried to stop for a traffic light near the A & P grocery store in Morristown, the brakes locked, causing his vehicle to spin around in the street and roll off the pavement into a nearby parking lot. He stated that he got out of the vehicle to examine his wheels but immediately drove back onto the highway and headed toward Knoxville at a speed of between 55 and 60 miles per hour. He described the ensuing collision as follows:

"Just as I got to this grocery store the Chevrolet in front of me—I started to go over to pass him. Just as I started to go, he swung out on me, and I hit him on his right rear. He went on across the highway, hitting the gas pumps and turned on his top and burst into flames. My car rolled off the side of the driveway there.

\*    \*    \*    \*    \*    \*

"Q. Do you remember the '64 Chevrolet in front of you—the Bullion car?

"A. Yes, I didn't see it until I got up on it.

"Q. All right. It was in front of you. Is that correct?

"A. Yes.

"Q. How far was the Bullion car when you first noticed it?

"A. Well, it was pretty—I couldn't say. From where I was at to get to them I would say about as far from here to the jail.

"Q. What was your speed at that time?

"A. 65.

"Q. The car in front of you, the Bullion Chevrolet what, if anything, did it do?

"A. Well, it had its blinkers on to turn right at the store there.

"Q. What, if anything, did you do in regard to speed?

"A. The brake lights came on and started to break the speed, and just like I said I started to pass him over in the outside lane. Instead of him turning the corner, he swung out to turn the corner. I was getting over and then he swung out in front of me, and I hit him right on that, the left rear with my right front."

The defendant denied that the 160 ft. of alleged skid marks which Officer Noe stated he found in the right hand lane for west bound traffic were laid down by his vehicle and stated that the debris from the collision was not located in the right hand lane but was in the center of the pavement provided for west bound traffic, more in the left hand lane than in the right hand lane.

Such is the evidence in this case.

IV

Assuming that defendant did not intend to kill the Bullions, does this evidence disclose that he intentionally committed a consciously unlawful act which he knew to be directly perilous to human life, which act resulted in their death?

One may infer from the testimony of witness May that immediately prior to and at the time of the collision the defendant was chasing or "tailgating" the automobile of the Bullions, "almost glued together, not over two feet apart," . . . "they had to be against one another, almost," at an extremely high rate of speed estimated by

the witness to be in excess of 90 miles per hour and that, while thus engaged, the right front end of the defendant's automobile collided with the left rear corner of the automobile of the decedents, causing it to leave the highway, knock down two gasoline pumps, overturn and catch afire, resulting in the death of its occupants. And, by his admission, the vehicle he drove was largely uncontrollable because of seriously defective brakes. In our opinion, this evidence, if believed by the jury, does show that the defendant intentionally committed a consciously unlawful act which was directly perilous to human life and known to him to be such, and, that this unlawful act resulted in the death of the decedents. Such conduct by the defendant implies "such a high degree of conscious and willful recklessness as to amount to that malignity of heart constituting malice." *Stallard v. State, supra.*

■ With all due respect to the Court of Criminal Appeals, we cannot agree with its conclusion that May's testimony is incredible and unworthy of belief. The testimony of this witness stands in the record unimpeached, and, apparently, was believed by the jury and the trial judge who affirmed the verdict of the jury. The Court of Criminal Appeals expressed disbelief that the Bullions would have "raced" with the defendant, a stranger to them. In our view, no "race" occurred. It is true that the record does not disclose any motive for the "tailgating" or chasing of the Bullion automobile by the defendant but ordinary human experience teaches that such things do happen. Moreover, while it is always enlightening to know the motive of one who commits a homicide, proof of motive is not essential to a conviction of murder. See *State v. Bullington*, Tenn., 532 S.W.2d 556 (1975). Nor do we agree that the "physical facts" are inconsistent with May's testimony. The extensive damage to the two vehicles and the force obviously necessary for the Bullion vehicle to tear two gasoline pumps from their foundations and, then to overturn onto its roof are facts consistent with a conclusion that these vehicles were traveling at a very high rate of speed when the collision occurred. The "skid" marks do not contradict May's testimony; instead, they would appear to contradict the testimony of the defendant that his vehicle did not cause them.

■ It is pre-eminently and uniquely the province of the jury and the trial judge, rather than an appellate court, to determine the credibility of the witnesses; they see and hear the witnesses, thus acquiring information bearing upon credibility which is not reflected in the printed transcript reviewed by appellate courts. *Holt v. State,* 210 Tenn. 188, 357 S.W.2d 57 (1962).

"Neither this Court nor the Court of Criminal Appeals is free to re-evaluate the evidence as it pleases. A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, Tenn., 493 S.W.2d 474, 476 (1973); *Shiflet v. State*, 216 Tenn. 365, 392 S.W.2d 676 (1965).

It is our conclusion that the evidence in this case does not preponderate against the verdict of the jury.

■ The only error assigned by the defendant in his motion for a new trial and, therefore, the only one decided by the Court of Criminal Appeals, questioned the sufficiency of the evidence to support the verdict. In this Court, he has assigned, but not briefed, alleged errors in the charge of the trial judge to the jury; such alleged errors must be deemed to have been waived. Rule 14(4), (5), Rules of Supreme Court.

The judgment of the Court of Criminal Appeals is reversed and that of the criminal court is affirmed. Costs are taxed against respondent.

COOPER, C. J., and FONES, HENRY and HARBISON, JJ., concur.