BUSTER CHARLES GRINDSTAFF, Plaintiff in Error,

*v.*

STATE OF TENNESSEE, Defendant in Error.

377 S.W.2d 921.

(*Knoxville,* September Term, 1963.)

Opinion filed March 5, 1964.

Petition for Rehearing Denied April 8, 1964.

STREET, BANKS, MERRYMAN, & MUSICK, Elizabethton, for plaintiff in error.

GEORGE F. McCANLESS, Attorney General, EDGAR P. CALHOUN, Assistant Attorney General, for the State.

MR. JUSTICE WHITE delivered the opinion of the Court.

The plaintiff in error was indicted upon a charge of murder in the second degree growing out of the collision of an automobile driven by him with another vehicle in which the deceased, Miss Kay Pierce, age 20, lost her life.

A jury found the defendant guilty of involuntary manslaughter and fixed his punishment at not less than one nor more than three years in the State Penitentiary. The judge sentenced him in accordance with the verdict. When his motion for a new trial was overruled he prayed for and was granted an appeal to this Court.

In perfecting his appeal to this Court the defendant, plaintiff in error, has assigned errors which, in essence, are that the evidence preponderates against his guilt and in favor of his innocence and that the trial judge erred in his charge of the applicable law to the jury.

Ordinarily this assignment (relating to the judge's charge) would not be considered since it was not set out in the motion for a new trial, Rule 14(5), Rules of this Court; nor was it brought to the attention of the trial judge by a special request. However, the charge of the court has been examined in detail and when the portion complained of is placed in context it is not misleading. Therefore, this assignment is overruled on both grounds.

The plaintiff in error is very frank to say in his statement of the case that "the issues in this appeal are very limited, because the defendant was in, or partially in, the wrong lane of traffic when the accident occurred. They are, as will be shown in a brief review of the evidence hereafter, (1) was the defendant under the influence of a drug or alcohol so that his driving ability was impaired, and (2) was his act of getting into the wrong lane one of *malum in se*, or merely *malum prohibitum*."

The collision of the automobile driven by the defendant with the automobile driven by Joe Pierce, father of the deceased, occurred on Highway 91 between Johnson City and Elizabethton, Tennessee. The defendant was pro-

ceeding in an easterly direction on said highway at a conservative and reasonable rate of speed, twenty to twenty-five miles per hour. The automobile, a Falcon station wagon, driven by Joe Pierce was proceeding in a westerly direction on said highway, and on the right hand side thereof, at a speed of thirty to thirty-five miles per hour. When the automobiles reached a point near the entrance to the Dixie Lanes Bowling Alley the collision occurred. The witness for the State, Curtis Emmert, described the accident by saying:

That he was traveling on the Elizabethton-Johnson City Highway when the accident occurred near a bowling alley and that he saw the vehicles as they came together. He said that he was following a truck and that the truck was following the automobile driven by Grindstaff, and that he had travelled in this manner and within a distance of about three hundred yards of the defendant's automobile for about a mile and one-half or two miles. When asked to describe the manner in which the defendant was driving his automobile he replied: ''Well, sir, he was weaving, in other words, he was going across the line.'' When asked by the District Attorney General to describe to the jury exactly how the collision occurred he said:

''He (defendant) crossed the line and hit the station wagon (Falcon), that's when they hit head on.

''Q. Was the station wagon on its proper side of the highway?

''A. Yes, sir.''

Oscar Dykes, Deputy Sheriff of Carter County, testified that he investigated the collision of two automobiles and that he talked with the defendant. He said that he

smelled either beer or whiskey on the breath of the defendant or about his automobile and that in his opinion the defendant was drinking.

This witness gave as his opinion that from what he saw and observed of the defendant that he could not say that his ability to drive an automobile was impaired by reason of the use or consumption of any alcohol. He did say that the defendant had sustained some cuts and bruises to his lips and his mouth and he was bleeding from these injuries.

Sam Frost, the Sheriff of Carter County, testified that he investigated the collision and found the station wagon on its proper side of the road and that the left rear wheel and both front wheels of the Plymouth, driven by the defendant, were in the left lane of traffic. The right rear wheel of the Plymouth was practically on the center line. The Sheriff said that he could smell the odor or beer in the automobile driven by the defendant and that the defendant talked like he was partially intoxicated, that he was "kindly thick tongued or lipped".

On cross-examination the Sheriff said that the defendant suffered some cuts and bruises about his mouth and that he was bleeding. He also testified that he couldn't swear that the odor of alcohol was coming from the defendant, nor could he swear that the defendant's ability to drive an automobile had been impaired by use of any alcohol, beverage or anything else.

Juanita Pierce Tolliver, a sister of the deceased, Kay Pierce, said that she was riding in the Falcon station wagon driven by her father and that the same was proceeding on its right hand side of the center line of the

highway. When asked to describe the actual collision of the automobiles, Mrs. Toliver said:

"When I looked up, out the windshield, I looked up the road and I saw a car, a Plymouth car, completely on our side of the road. I saw the grill and could tell that it was a Plymouth, and it hit us just them."

The defendant testified that he owned and operated an auto parts business and did minor mechanical work on automobiles. He denied that on the date of the automobile collision in question that he had been drinking anything with alcoholic content and that it had been at least two months since he had anything intoxicating to drink.

On the morning of May 20, 1963, at about 8:30 o'clock, the defendant left his home to take a water pump to Johnson City for repairs and that he was driving the Plymouth automobile involved in the collision.

After having the water pump repaired the defendant "commenced to get a little nervous" and decided to wait until his wife got off from her work to take her back home. While waiting, he went to a restaurant, a drive-in, and got a sandwich and a milk shake. He then took two nerve tablets which had been prescribed for him by his doctor. After eating part of the sandwich and drinking part of the milk shake and taking the pills, he felt better and then he remembered that his wife was driving the automobile of her sister and it would not be necessary for him to wait for her. Then he started home, leaving Johnson City shortly after 2:00 o'clock, P.M. The accident occurred some thirty to forty-five minutes thereafter. He stated that as he drove East on Highway 91 he was driving thirty-five to forty-five miles per hour

and when asked to detail the incidents leading up to the collision, he said on direct examination:

"A. I began to get drowsy and sleepy.

"Q. You say you had lost sleep the night before?

"A. I had been up, I might have slept an hour or two.

"Q. Well, where is the last—At the time that this accident happened, do you know what your condition was at that time?

"A. Well, I was just sleepy, but I had drove sleepy before and, you know, it would wear off in a few minutes. I knowed I was getting sleepy, and I intended to stop up there at the Pig and Whistle and I thought I would stop and get me a cup of coffee, and there were cars coming and I just didn't stop."

The defendant had travelled some two or three hundred yards past the Pig and Whistle when the accident occurred. He said that he did not turn in the Pig and Whistle to get the coffee because of the traffic of cars going in and pulling out of this eating place. The defendant really remembers nothing after passing the Pig and Whistle, and when asked why he could not remember he said:

"I don't know if I dozed off or what, but the next thing I remembered, I thought that a woman had pulled out across from the Bowling Alley (Dixie Lanes) in front of me."

On cross-examination he was asked again about taking the pills to settle a nervous stomach, and said that he had only taken two of them at Johnson City at the place where he ate lunch and that this was around 2:00 o'clock,

in the afternoon, before the accident which occurred at about 3:00 P.M. He said ordinarily that the pills seemed to "quiet his nerves and settle his hands and took the numbness out of them".

The defendant said that as he drove down the highway toward Elizabethton, when he reached a point near the cemetery not far from where the accident occurred, he was getting sleepy and that he does not remember weaving across the highway because "well, I was drowsy and sleepy". He was then asked if he remembered when he came to the Pig and Whistle and he said "Yes", and that he had intended to stop there to get a cup of coffee but he failed to stop for the reasons indicated hereinabove. He was asked:

"Q. At that time you still had presence of will and mind enough to stop that car, but you didn't stop it?

"A. Well, I could have right then.

"Q. And you could have called from there for somebody at home to come and drive you home, couldn't you?

"A. Well, yes, I could have.

"Q. While you still had your presence of mind you continued to drive up the highway knowing that you were sleepy and about to pass out?

"A. Well, like I said, I had drove sleepy before * * *

\* \* \* \* \* \*

"Q. After you passed the Pig and Whistle, you were so sleepy you were not conscious of what was going on?

"A. After I passed the Pig and Whistle I just can't remember anything that happened.

* * * * * *

"Q. And you were not aware of the fact that you were on the wrong side of the road and hit this car, were you?

"A. No, sir."

The beer on the floorboard of the back seat of defendant's car was accounted for by Henry Cook. He said that he placed a carton containing six bottles of beer in defendant's car and covered it with a quilt without the knowledge of Mr. Grindstaff. When he learned of the indictment of defendant he came forward and stated that he had placed the beer as indicated to conceal it for future use. Immediately thereafter he made a trip out of state and did not return until after the accident had occurred.

Therefore, the presence of the beer seems to be sufficiently explained and witnesses for the State do not say positively that the defendant was intoxicated when they talked with him a few minutes after the collision, nor do they say that his ability to drive was affected by an intoxicant. Witnesses for the defense say that defendant was sober immediately after the collision and there was no odor of alcohol about him.

The defendant was charged in the indictment with murder in the second degree, but the jury found him guilty of involuntary manslaughter. He contends here, through able and persuasive counsel, that the evidence does not support the conviction in that there is no credible proof that the defendant was under the influence of any drug or intoxicant to the extent that his ability to drive an automobile was impaired.

The proof offered by the State that Mr. Grindstaff was driving an automobile while under the influence of

of an intoxicant is neither strong nor convincing. However, there was strong proof which is not credibly denied that the defendant was driving his automobile down the public highway, weaving from his lane of traffic into the left hand lane and back again. This continued, according to the proof, for some distance prior to the collision of the automobiles producing the death of the young lady riding in the Falcon station wagon driven by her father.

The cause of such driving which, of course, amounted to careless and reckless conduct, was supplied by the defendant when he said that although drowsy and sleepy he continued to drive. He says that he remembers nothing from a few moments before the accident when he passed the Pig and Whistle and the actual collision of his car and the one driven by Mr. Pierce. He cannot recall anything of the details of the accident.

He explains his condition by saying that he had slept very little the preceding night and had taken some pills to quiet his nerves some thirty to forty minutes before the accident. The type, kind or content of the pills is not revealed by the testimony. The defendant merely said that they were prescribed for him to ''settle his nerves or settle his nervous stomach''. The jury could have, from the evidence, and no doubt did, conclude that these pills contained some drug which had a tranquilizing effect on the nervous system of the defendant. The jury could also have found that the defendant went to sleep while driving and that his conduct in failing to bring his car to a stop when he still had presence of mind to know his condition constituted gross and criminal negligence. The verdict finding the defendant guilty of involuntary manslaughter, based upon either conclusion, is amply supported by the evidence.

T.C.A. sec. 59-1031 provides that it shall be unlawful for any person to drive or be in physical control of any automobile or motor driven vehicle on any of the public roads and highways of this state while under the influence of an intoxicant, or while under the influence of narcotic drugs, or while under the influence of certain drugs producing stimulating effects on the central nervous system.

Such drugs are defined to include the salts of barbituric acid, or any compound, derivatives, or mixtures thereof that may be used for producing hypnotic or somnifacient effects, etc. The trial court read this section of the Code to the jury and gave proper instruction in regard to the application that it might make of this statute to the facts of the case in the event the jury found the defendant guilty of violating this law.

The court properly defined involuntary manslaughter in a case of this kind as follows:

"Involuntary Manslaughter is where it plainly appears that neither death nor bodily harm was intended by the party killing and that death was accidentally caused by some unlawful act, or by some act not strictly unlawful in itself, but done in a reckless and unlawful manner and without due caution, and that death was the natural or probable result of such act. Involuntary Manslaughter necessarily negatives any intent on the part of the accused to kill another, but does not negative an intent to do an unlawful act or an act not unlawful in itself but done in an unlawful manner and without due caution."

Over the years the death rate of persons on the highways of our State has steadily increased in proportion

to the increased number of motor vehicles in operation. This has resulted in many charges of homicide against the operators of automobiles. This is another of these tragic cases. In the instant case, a young twenty-year-old girl lost her life by reason of the negligent and careless conduct of this defendant. We must approve the verdict of the jury and the judgment of the trial court thereon. This defendant was guilty of such gross, reckless, and careless conduct as to evince a disregard for the rights of others who were properly and lawfully upon the highway.

According to the proof this defendant drove his car in a weaving manner for some distance prior to the actual collision of the vehicles.

██ Although he recognized his drowsy condition he continued to drive despite the fact that he knew or should have known that such conduct would in all likelihood produce the sort of tragic result which it in fact did produce. This, in our opinion, makes him guilty of an act *malum in se*. An act *malum in se* is defined as a wrong in itself; an act involving illegality from the very nature of the transaction. See Black's Law Dictionary, p. 1112; *Whitlock v. State*, 187 Tenn. 522, 526, 216 S.W.2d 22, 24 (1948); 38 C.J., p. 520; See also 54 C.J.S., p. 909.

In Miller, Criminal Law (1934), at 287, it is said that if a person, in doing a lawful act which might produce death or serious bodily harm, if done without due caution and circumspection, neglects to take such precautions as a reasonable man would take to prevent injury, he is guilty of involuntary manslaughter, if, by reason of his neglect, some other person is killed. This is a general statement of the law supported by authorities

throughout the country. See 1 Wharton's, Criminal Law and Procedure (Anderson ed. 1957), Section 290.

In the case of *Reed v. State,* 172 Tenn. 73, 110 S.W.2d 308 (1937), an appeal from a conviction of involuntary manslaughter involving the negligent operation of an automobile there was a conflict in the testimony as to whether the defendant was under the influence of intoxicating liquor at the time of the collision producing the death. In sustaining the conviction, Mr. Chief Justice Green said that it was not necessary to deal with this conflict because, if, indeed, the defendant were entirely sober, the case made out against him by the State is even worse. The facts were that the defendant approached a truck from the rear and undertook to pass it. As he did so he grazed a car and after getting past this car and over on his left hand side of the road his car collided almost head on with the car driven by the deceased.

The Court said:

"[I]t is quite obvious that no driver, exercising even small care, would have undertaken to pass the truck in front of him as defendant did, traffic conditions being what they were."

The Court, in finally disposing of the Reed case, said:

"In the case before us, in view of the traffic on this highway, this collision was not only a probable result but almost an inevitable result of such negligence as the defendant's. Likewise we think the act of defendant in undertaking to pass this truck, turning out to his left in heavy and closely approaching opposing traffic, was an act malum in se. It was an act on a par

with firing a gun into a crowded street, or dropping a heavy object into such a street from a tall building."

In the case of *Trentham v. State,* 185 Tenn. 271, 206 S.W.2d 291 (1947), the Court held that the conduct of the defendant in driving a high-powered automobile around a curve on the wrong side of the highway at a speed of fifty to fifty-five miles per hour was gross negligence so that when this gross negligence resulted in the death of the driver of an oncoming automobile which was hit by that driven by the defendant on that curve, the Court affirmed his conviction of involuntary manslaughter. For other cases involving similar situations, reasoning and results see *Copeland v. State,* 154 Tenn. 7, 285 S.W. 565, 49 A.L.R. 605 (1926); *Potter v. State,* 174 Tenn. 118, 124 S.W.2d 232 (1939); *Smith v. State,* 196 Tenn. 168, 264 S.W.2d 803 (1954); *Smith v. State,* 198 Tenn. 395, 280 S.W.2d 922 (1955); and *Bolinger v. State,* 207 Tenn. 98, 338 S.W.2d 560 (1960).

█ It has long been the law of this State that a conviction in a criminal case will not be reversed on the facts unless it is shown that the evidence preponderates against the verdict and in favor of the innocence of the accused. The plaintiff in error has failed to carry this burden. *McBee v. State,* 211 Tenn. 15, 372 S.W.2d 173, (1963); *White v. State,* 210 Tenn. 78, 84, 356 S.W.2d 411, 414 (1962).

Upon a thorough review of the entire record in the case we are fully satisfied that the assignments are without merit and must be overruled. Therefore, for the reasons appearing herein, the judgment of the trial court is affirmed.

BURNETT, CHIEF JUSTICE, and FELTS, DYER and HOLMES, JUSTICES, concur.

On Petition to Rehear

MR. JUSTICE WHITE.

A petition has been filed in this case in which it is prayed that "an order be made and entered permitting him to serve his sentence in the Carter County Jail rather than the State Penitentiary", and for general relief.

T.C.A. sec. 40-3105 provides that where a person has been convicted of a felony and the jury shall fix his punishment at five years or less, the court, in its discretion, may order such convicted person confined in the county workhouse for the term of such sentence, provided that the trial judge shall have the power to order the removal of the prisoner from the county workhouse to the penitentiary whenever, in his opinion, such prisoner is being treated in a brutal or inhuman manner, or when it shall appear to him, the trial judge, that the physical condition of the prisoner is such that work on the road is deleterious to his health.

This is, therefore, a matter vested within the discretion of the trial judge by an Act of the Legislature and he may consider a petition asking for such relief when the case of a convicted person is still within the jurisdiction of the court. However, in this case the jurisdiction of the trial judge over this defendant has been removed by the appeal prayed for and perfected herein.

In *Thomas v. State*, 201 Tenn. 645, 301 S.W.2d 358 (1957), this Court did remand with direction that the sentence be served in the Davidson County Workhouse.

However, the Court stated that the specific purpose to be served by the remand was to enable a mental examination of the defendant to determine the effect of amnesia upon his mind, an issue which had been raised but not developed upon the trial.

A like or similar situation is not present in this case. If the defendant has been desirous of serving his sentence in the local jail, application should have been made in the first instance to the trial judge who would have responded, as the petitioner now ask that we do, if the judge had thought it proper to do so in the circumstances. By virtue of his knowledge of local conditions, the trial judge is in a far better position to exercise the discretion vested in him by said section than we are when we are guided only by the record appearing before us.

In view of the foregoing, the petition is denied.