**STATE of Tennessee, Appellee,**

v.

**Leslie S. NORRIS, Appellant.**

Court of Criminal Appeals of Tennessee,
at Jackson.

May 5, 1993.

Permission to Appeal Denied by
Supreme Court Sept. 7, 1993.

W. Mark Ward, John R. Candy, Memphis, for appellant.

Charles W. Burson, Atty. Gen. and Reporter, Rebecca L. Gundt, Asst. Atty. Gen., Nashville, for State of Tennessee.

## OPINION

WALTER C. KURTZ,[1] Special Judge.

The defendant, Leslie S. Norris, appeals as of right from his conviction for two counts of aggravated assault. The defendant received two consecutive sentences of six (6) years on each aggravated assault, for a total sentence of twelve (12) years.

A number of issues are presented for review by the appellant. They are: (1) the sufficiency of the evidence; (2) the admissibility of a photograph; (3) the admissibility of the testimony of a witness; (4) the impropriety of a statement made by the prosecutor during closing argument; (5) the completeness of the trial judge's instruction to the jury; (6) the failure of the trial judge to charge a lesser included offense in the jury instructions; (7) the possible excessiveness of the sentences imposed; and (8) the trial judge's possible error in imposing consecutive sentencing.

We find no prejudicial error related to the convictions or the length of sentence but reverse on the issue of consecutive sentencing.

This case involves a conviction for aggravated assault based upon the collision of two automobiles. The defendant, while driving on the wrong side of the street collided head-on with another vehicle carrying four (4) teenage girls.

On the morning of August 2, 1990, in Shelby County, the defendant, a college student, drove to his part-time job in his automobile. The weather conditions were clear and dry. At approximately 10:00 a.m., while on Stout Road, which is in a residential neighborhood, the defendant crossed the center line into the opposite lane of traffic and collided head-on with a car being driven by Tonya Hunt. There was no indication, such as skid marks at the scene, that the defendant had applied his brakes prior to the impact. Ms. Hunt and her passengers, Lisa Schoggen, Julie Neville, and another girl, all teenagers, were on their way to Jackson Tennessee. The two young women in the front seat, Ms. Schoggen and Ms. Hunt, were very severely injured. The other two passengers were also injured.

Tonya Hunt received among other injuries, broken bones in her face, a broken nose, a broken left arm and right leg, and a broken jaw. Her spleen had to be removed and her eye replaced in its socket. Ms. Hunt remained in the hospital for approximately six weeks and has had five or six operations due to this incident. She remembers little of the collision except that just before the impact she saw a red car in the wrong lane coming right at her.

Lisa Schoggen sustained a heavy blow to her head and a resulting blood clot. She was in a coma for several months and remained in the hospital for ten and one half months. Ms. Schoggen suffers permanent brain injury. She has difficulty in caring for herself, and will never again be able to function normally.

---

1. Judge Kurtz was sitting by designation with the Court of Criminal Appeals at Jackson by order of the Chief Justice of the Supreme Court dated November 20, 1992.

At the trial the State produced a witness, William J. Singler, who had seen the defendant driving just prior to the collision. Mr. Singler stated that he was driving on McVay Street, which was only a few blocks from the scene of the collision, when the defendant's vehicle came up behind him "pressing" him and "tailgating so to speak." Mr. Singler thought that the driver appeared anxious to get around him, and when Mr. Singler turned off McVay, the defendant's automobile "zoomed around him." Later that morning, Mr. Singler drove back through the neighborhood, saw the scene of the collision, and recognized the defendant's car. Mr. Singler stopped and reported his prior observations to the police.

The defendant was also injured in the collision. He was able, however, to get out of his vehicle. When the police and ambulance personnel arrived, he stood by before being placed in an ambulance and taken to the emergency room. At the scene of the accident he was approached by a police officer who asked him if he was driving. The defendant replied that he had not been driving but that a friend had been driving. That same officer smelled a slight smell of alcohol and observed that the defendant's speech was slightly slurred and he was off balance.

The State put into evidence, without objection, the result of a blood test taken at the hospital at 1:40 p.m., some three hours and forty minutes after the accident, which showed that the defendant had a blood alcohol reading of .02%. Further expert testimony at the trial, presented without objection as to its relevance, indicated that a reading of .02% at 1:40 p.m. could be extrapolated to a blood alcohol level of between .04% and .07% at 10:00 a.m., the time of the collision.

The defendant testified that he and a friend had gone out the night before and done a fair amount of drinking. The defendant's friend, Kevin, had driven them both that night. The defendant and Kevin returned to the defendant's home where he lived with his parents, and both he and Kevin spent the night there. The next morning, the defendant got up around 9:00 a.m. and left for his part-time job about 9:50 a.m. in his own car. Kevin was not with him.

The defendant related that while he was proceeding to work on McVay Street, he came to a curve, and as he went around the curve, he "lost the power steering," crossed the center of the roadway, and collided head on with the other car. He stated that he did not intend to cross the yellow line. The defendant says that he has very poor memory of the accident because of his head injury. He could not remember any incident before the accident like that described by Mr. Singler, and he could not remember any conversation that he had at the scene of the accident. The defendant contended that he never denied that he was the driver of the vehicle.

The defendant's father testified. He stated that several months prior to the August 2 collision there had been a problem with the steering on the defendant's car. The father testified as to how the rod controlling the steering had broken and then been welded. The prior welding of the power steering rod was confirmed by still another witness. The father testified that after the accident he went out to see the car and saw that the rod had broken again at the point of the weld. He explained that he made no photographs of the broken power steering rod because he did not believe that his son had done anything wrong, and would not be charged with a crime. When the indictment was returned, some eight months after the accident, the defendant's father tried to locate the automobile but it had been sold for scrap.

The indictment in this case charged the defendant with "unlawfully and recklessly" causing serious bodily injury to Lisa Renee Schoggen and Tonya Leigh Hunt in violation of T.C.A. § 39–13–102. A violation of T.C.A. § 39–13–102 is committed when a person commits "an assault as defined in T.C.A. § 39–13–101" and serious bodily injury results. An assault is committed when a person "recklessly" causes bodily injury to another. T.C.A. § 39–13–101(a)(1). "Reckless" is defined at T.C.A. § 39–11–106(a)(31) as follows:

"Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of

but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

T.C.A. § 39–11–106(a)(33) defines "serious bodily injury" as follows:

> "Serious bodily injury" means bodily injury which involves:
>
> (A) A substantial risk of death;
>
> (B) Protracted unconsciousness;
>
> (C) Extreme physical pain;
>
> (D) Protracted or obvious disfigurement; or
>
> (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty.

It has long been the law in this state that the reckless driving of an automobile which results in the death of another can, under appropriate circumstances, result in a conviction for manslaughter and even second degree murder. *See, e.g., Grindstaff v. State,* 214 Tenn. 58, 377 S.W.2d 921 (1964) (involuntary manslaughter) and *State v. Johnson,* 541 S.W.2d 417 (Tenn.1976) (second degree murder). Likewise, if instead of death, serious bodily injury results from the reckless use of an automobile, then an aggravated assault conviction was possible. *See, e.g., State v. Bullington,* 702 S.W.2d 580 (Tenn.Crim.App. 1985). With this common law and statutory history behind it, these principles, with some modification, have been carried forward into the present criminal code. There is now a specific statutory provision for vehicular homicide by intoxication or by reckless conduct, (T.C.A. § 39–13–213); vehicular assault by intoxication, (T.C.A. § 39–13–106); and aggravated assault by reckless conduct, (T.C.A. § 39–13–102), all allowing convictions for death or injury resulting from the reckless or intoxicated driving of a motor vehicle. In this case, intoxication was not alleged in the indictment, and the State proceeded under T.C.A. § 39–13–102 (aggravated assault) rather than T.C.A. § 39–13–106 (vehicular assault by intoxication).

The Court will now turn to the specific issues raised by the appellant.

### 1. SUFFICIENCY OF THE EVIDENCE

A jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State. *State v. Hatchett,* 560 S.W.2d 627, 630 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which might be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as trier of fact. *Byrge v. State,* 575 S.W.2d 292, 295 (Tenn. Crim.App.1978). This court may not reevaluate the evidence or substitute its inferences for those drawn by the trier of fact from the evidence. *Farmer v. State,* 574 S.W.2d 49, 51 (Tenn.Crim.App.1978); *State v. Grace,* 493 S.W.2d 474, 476 (Tenn.1973). A conviction may only be set aside when the reviewing court finds that the "evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R.App.P. 13(e).

The defendant contends that the evidence of his recklessness is circumstantial and "is made up of speculation and conjecture, not positive evidence" and that the State asks this court "to assume recklessness merely because the accident occurred across the center line of the roadway" (Appellant's Brief at p. 23). The appellant argues that if this court adheres to the rule of reasonable doubt applied in circumstantial evidence cases, then the proof is not sufficient to support the conviction.

The defendant relies primarily on *Newby v. State,* 215 Tenn. 609, 388 S.W.2d 136 (1965) to support his position. In *Newby,* the defendant was involved in a head-on collision in which four people were killed. The impact appeared to have occurred on the south shoulder of the highway and the appellant was driving west. Thus, he crossed over the center lane at the time of impact. The high-

way was, however, wet and "slick". At the scene, there was a strong odor of alcohol on the defendant's person and three unopened cans of beer were discovered in his car. There were no eyewitnesses to the collision. There were no skid marks from the defendant's automobile. No witness testified as to the speed of the cars or whether there were other vehicles on the roadway immediately preceding the impact. Furthermore, the only witness who was asked whether the defendant appeared intoxicated could not testify that he was intoxicated. The Supreme Court reversed the defendant's conviction for involuntary manslaughter. The Supreme Court noted that there was no evidence of any conduct at the scene of the accident or at the hospital that the defendant was under the influence of an intoxicant. Further, the court reasoned that the odor of intoxicant was insufficient to support a finding of driving under the influence and there was no evidence that the defendant drove on the wrong side of the road. The court found that his presence on the wrong side of the road might have easily been caused by skidding on the wet, slick roadway without criminal negligence on the part of the defendant. *Id.* 388 S.W.2d at 139.

The facts in this case, however, are more analogous to those in *State v. Johnson, supra.* In *Johnson,* the defendant approached the victims' vehicle from the rear and struck it, knocking the vehicle from the road and causing a collision with a stationary object which resulted in the death of the occupants. Another witness had seen the defendant "tailgating" and speeding about a mile from the scene of the collision. Even the defendant admitted he knew he had bad brakes on his car. The defendant, however, stated that the accident was not the result of his bad brakes, but caused by the decedent's vehicle inexplicably pulling in front of him when he went to pass. The court acknowledged that the proof against the defendant was circumstantial, but concluded that the issue of implied malice is normally for the jury's deter-

mination and that there was evidence in the case to sustain the jury's determination.

■ When a driver drives on the wrong side of the road, there is an inference to support implied malice or in this case, recklessness. This issue was addressed in *Trentham v. State,* 185 Tenn. 271, 206 S.W.2d 291 (1947), in which the court sustained a conviction for involuntary manslaughter where the defendant was driving on the wrong side of the road.

In *Potter v. State,* 174 Tenn. 118, at pages 127 and 128, 124 S.W.(2d) 232, at page 236, the Court laid down the rule that not every casual or incidental driving on the wrong side of the road where a collision ensues, is there criminal liability, but made this further observation:

"The test appears to be whether or not the driver, violating the highway statute in the particular above considered, does so consciously, or under circumstances which would charge a reasonably prudent person with appreciation of the fact and the anticipation of consequences injurious or fatal to others. For example, one who drives over the crest of a hill on the wrong side of the road, or who drives out from behind a line of congested traffic into the face of near approaching vehicles (as in the recently reported case of *Reed v. State,* 172 Tenn. 73, 110 S.W.(2d) 308), can hardly be acquitted of criminal negligence on his plea of inadvertence. The demand for diligence and caution is too imperative under such conditions to be so excused. In this class of cases the defendant must be held to have knowingly violated the law, and must be held to the consequences, whether foreseen or not. *Such cases call for application of a rule of unrebuttable presumption of conscious indifference.*" [2]

. . . .

In the present case, the defendant had no superior right upon this highway to the deceased. Their rights were equal. Each was entitled to half of the road, and when

---

**2.** This mandatory presumption overstates the principle as an "unrebuttable" presumption is unconstitutional. *See, e.g., State v. Merriweather,* 625 S.W.2d 256 (Tenn.1981) and *State v. Bryant,* 585 S.W.2d 586 (Tenn.1979). This does, however, illustrate the rebuttable inference that may be drawn from the fact a defendant is driving on the wrong side of the road.

the defendant went across the middle line of the highway he was trespassing upon the highway rights of another. We cannot shut our eyes to the expected shocking consequences that not only will probably result but are also expected to result in turning a sharp curve with a high-powered motor vehicle running at a high rate of speed, to wit, 50 to 55 miles per hour, on the wrong side of the road. Such conduct keeps equal cadence with the driver who heedlessly undertakes to pass a motorist in front of him on the crest of a hill, or who undertakes to drive out from behind the line of congested traffic into the face of approaching vehicles. Where one undertakes to pass another vehicle on the crest of a hill, one's view is obstructed, and this is equally true where one undertakes to go around a sharp curve on the wrong side of the road when an oncoming vehicle could not be seen. The result is not only probable but reasonably expected mischief, and such conduct amounts to gross negligence. (emphasis added).

*Id.* at 273–74, 206 S.W.2d 291.

The proof in this case that supports the jury verdict is substantial:

A) The defendant was driving on the wrong side of the street;

B) The day was clear, the roadway was dry;

C) Just a block or two prior to the collision, the defendant was seen, if not driving recklessly, at least driving in a careless, hurried, and anxious manner;

D) The defendant had a blood alcohol level of .02% at 1:40 p.m. which would support a finding that his blood alcohol level would have been between .04% and .07% at the time of the collision (10:00 a.m.);[3]

E) The defendant falsely told a police officer at the scene that a friend was driving;

F) The defendant's explanation for driving on the wrong side of the road might well have been disbelieved by the jury. The defendant said he lost control of the car when his power steering malfunctioned. His father testified that subsequent to the accident he viewed the automobile with a broken power steering rod, but failed to take any photographs, or make any effort to preserve the automobile, thinking that his son had done no wrong. It was not until eight months later, at the time of the return of the indictment, that he went to look for the car and it could not be found. The jury might well find this story so implausible as to provide affirmative evidence of guilt. A reasonable juror might well infer that even if the defendant and his father believed that no criminal charges would be brought, it would be reasonable to expect that a civil suit would be brought when four persons were injured by a driver on the wrong side of the road, and surely they would have preserved some evidence of the broken power steering rod.

The leading case of *Wilson v. United States,* 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090 (1896) explains the use of false testimony.

Nor can there be any question that if the jury were satisfied from the evidence that false statements in the case were made by defendant or on his behalf, at his instigation, they had the right, not only to take such statements into consideration in connection with all the other circumstances of the case in determining whether or not defendant's conduct had been satisfactorily explained by him upon the theory of his innocence, but also to regard false statements in explanation or defense made, or procured to be made, as in themselves tending to show guilt.

*Id.* at 620–21, 16 S.Ct. at 898–99. This holding is consistent with Tennessee law on the

---

**3.** The proof of alcohol consumption in this case, leads this court to observe that if the State was relying upon intoxication to support a conviction, it perhaps should have proceeded under T.C.A. § 39–13–106 rather than § 39–13–102. The court finds somewhat confusing, the fact that the State proceeded to prosecute this case under the statute related to recklessness by non-intoxi-

cation, and yet, put in evidence of alcohol consumption and possible intoxication. The defense, however, did not object to this evidence, nor raise any issue at the trial, or in the motion for new trial, directed to the relevancy of this evidence. This court expresses no opinion on this issue.

subject. *See generally*, Raybin, *Tennessee Criminal Practice and Procedure*, § 27.285.

The jury listened to the testimony of the defendant and his father and they chose to disbelieve it. This court is not in a position to substitute its judgment on the credibility of witnesses for that of the jury.

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bowlin v. State*, 219 Tenn. 4, 405 S.W.2d 768, 771 (1966).

There was ample evidence from which a rational trier of fact would conclude that this appellant was guilty beyond a reasonable doubt.

## 2. *ADMISSIBILITY OF THE PHOTOGRAPH*

■ Even though there was other proof to support a finding that the victim Tonya Hunt had suffered serious bodily injury, the State, over objection, put into evidence a photograph of Ms. Hunt's head injuries taken in the emergency room. Defense counsel contended that the photograph was cumulative and extremely prejudicial evidence. He stated that while he would not contest that the victim's suffered serious bodily injury, he would not stipulate to it. The trial judge in ruling on the objection stated that he would have sustained the objection if defense counsel had stipulated to serious bodily injury, but since defense counsel would not stipulate he would not deprive the State of the use of the photograph as evidence. He also stated that he would disallow the photograph only if it had exceeded "the conscience of the court." [4]

■ This Court has viewed the photograph and finds no error on the part of the

4. An imperfect reference to T.R.E. 403.

trial judge. T.R.E. 403 would only exclude the photograph if the "probative value [was] substantially outweighed by the danger of unfair prejudice...." Photographs are generally relevant to prove the extent of injuries. *See, e.g., State v. Brown*, 756 S.W.2d 700 (Tenn.Crim.App.1988). Defense counsel would not stipulate to the element of serious bodily injury which might well have given more strength to his complaint. *See Gladson v. State*, 577 S.W.2d 686, 687 (Tenn.Crim. App.1978). The admissibility of photographs generally lies within the discretion of the trial court whose ruling in that respect will not be overturned except upon a clear showing of abuse of discretion. *See State v. Banks*, 564 S.W.2d 947, 949 (Tenn.1978). In this case, the trial judge could have excluded the photograph, but he did not abuse his discretion by admitting the photograph.

## 3. *ADMISSIBILITY OF MR. SINGLER'S TESTIMONY*

■ The appellant contends that Mr. Singler should not have been allowed to testify as to the defendant's manner of driving just prior to the accident. The defendant contends that this prior driving was too remote. There may be circumstances when the proof of driving conduct before a collision is too remote in time and/or distance to be probative or where the probative value is substantially outweighed by the danger of unfair prejudice, but this case is not one of them.

In this case, Mr. Singler's testimony related to the defendant's conduct just a block or two from the collision site and just before the collision took place. This testimony has an even stronger connection than that referred to in *State v. Johnson, supra* at 420–21, where the witness testified to the driving conduct of the defendant "about two miles east of the scene of the collision". *Id.* at 420. The evidence in this case is sufficiently close in time and distance to be admissible. *See Reed v. Allen*, 522 S.W.2d 339, 343–45 (Tenn. App.1975) (discusses principles of remoteness and admissibility of driving conduct of offending vehicle prior to accident).

### 4. IMPROPRIETY OF A STATEMENT MADE BY PROSECUTOR DURING CLOSING ARGUMENT

■ The defense counsel in closing argument predictably argued that the defendant's conduct was not criminal and that the collision was merely an accident. The prosecutor during her rebuttal argument suggested that the jury should not let the defendant buy his way out of the case.[5] Specifically, she said:

> But he's concerned now. And now he wants you to say it's okay. We don't want to hold you criminally responsible for your actions. It's okay. That's fine. You can go back out and drive. We don't think that this Judge should have anything to do with any type of sentencing or anything else. It's okay what you did. It's okay the way you were driving. These things happen. *Maybe we should just let you buy your way out of it if you can.* (emphasis added).

The defense counsel objected by stating "that's outside the record. I object to it and ask the Court to order its stricken from the record and the jury not to consider it." The judge failed to sustain the objection. The judge did tell the jury that "it's customary to let lawyers argue their case." He then went on to tell the jury, "I've already instructed you how to accept the lawyer's arguments, either side, and if you do not feel that the lawyer's arguments are supported by the proof, what did I say? You should disregard them. I should not have to tell you again. You may proceed." The prosecutor then continued her argument but did not refer again to the defendants' "buying" his way out or his wealth or station in life.

The prosecutor's argument was improper and intemperate. The objection should have been sustained and the jury instructed to disregard. The proof at trial showed that the defendant was driving a Corvette when the collision happened and was driving another new model car at the time of the trial which was purchased by the defendant's father. The defendant was shown to live in Germantown and one might surmise that the

prosecutor would not have been displeased if the jury had inferred that the defendant was a "spoiled rich kid".

■ Remarks of this sort accusing the defendant of "buying" his way out of criminal charges have been condemned by a number of courts. It is generally recognized that arguments calling attention to the defendant's wealth or means, or his ability to retain counsel, to pay them large fees, or to finance his own defense, are highly prejudicial. *See generally,* Annotation, *Counsel's Reference in Criminal Case to Wealth, Poverty, or Financial Status of Defendant,* 36 A.L.R.3d §§ 3, 4. As one court pointed out in reversing a murder conviction:

> [The defense attorney's] appearance on behalf of the defendant would be in his official capacity as one of the sworn officers of the court. Therefore the reference to his fee or to the ability of the defendant to pay a fee was improper. The defendant was charged with murder, and not with being wealthy, and no reference should have been made to his station in life.

*Goff v. Commonwealth,* 241 Ky. 428, 44 S.W.2d 306, 308 (1931). *See also, United States v. Socony–Vacuum Oil Company,* 310 U.S. 150, 237–39, 60 S.Ct. 811, 850–51, 84 L.Ed. 1129 (1940) (argument of prosecutor regarding power and wealth of the defendants condemned. Appeals to class prejudice are "highly improper" and "undignified and intemperate." "They do not comport with the standards of propriety to be expected of the prosecutor"); *Sizemore v. Fletcher,* 921 F.2d 667, 760–71 (6th Cir.1990) (habeas corpus granted in murder conviction because prosecutor in closing argument appealed to wealth and class biases and made reference to defendant's wealth and station in life) and *Mitchell v. State,* 28 Ala.App. 119, 180 So. 119, 112 (1938) (conviction reversed for several errors including the prosecutor's closing argument addressed to the defendant that "you thought you could take your money and beat the case"). *See also,* DR 7–106(C)(1).

---

5. The State, in its brief before this court, made no attempt to justify or defend the prosecutor's remark except to make the illogical argument that it was in response to the defense lawyer's argument that the event was an "accident" and that his client has no criminal intent.

 Was this argument reversible error? In the case of *Judge v. State,* 539 S.W.2d 340, 344 (Tenn.Crim.App.1976), this court listed five factors which would be considered in determining whether "inappropriate conduct" could have effected the verdict of the jury to the prejudice of the defendant. These factors are:

(1) The conduct complained of viewed in the context of the light of the facts and circumstances of the case.

(2) The curative measures taken by the Court and the prosecution.

(3) The intent of the prosecutor making the improper statement.

(4) The cumulative effect of the improper conduct and any other errors in the record.

(5) The relative strength or weakness of the case.

In addition, the reviewing court may consider whether the remarks were lengthy or repeated or whether single or isolated. *Id.* at 344. It is also important to consider the reason why appellant courts reverse for improper argument. Cases are reversed only when the remarks "so infected the trial with unfairness as to make the resulting convictions a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974).

The Court has considered all these factors and concludes that the remark was harmless beyond a reasonable doubt. *See State v. Payne,* 791 S.W.2d 10, 20 (Tenn.1990) and *State v. Tyson,* 603 S.W.2d 748, 754 (Tenn. Crim.App.1980). Although the trial judge should have sustained the objection, he did take some remedial action and the remark was not repeated. *See Lackey v. State,* 578 S.W.2d 101, 107 (Tenn.Crim.App.1979) (holding that trial court should have sustained the objection to the improper argument but his instruction to the jury "was sufficient to call the disputed evidence to the jury's attention and render the remark harmless"). The prosecutor's comment about the defendant's

wealth was the only comment during her argument to draw an objection and it was an isolated incident. The prosecutor engaged in no other improper conduct and the trial "atmosphere" was one of decorum and propriety. *Judge v. State, supra* at 344.

By not reversing this conviction for this improper argument, the court is concerned that lawyers will continue to make arguments ignoring appropriate rules governing the final argument. Improper argument threatens the verdict. Both the Supreme Court of Tennessee and this court have reversed for improper argument. *See, e.g., Smith v. State,* 527 S.W.2d 737 (Tenn.1975); *Russell v. State,* 532 S.W.2d 268 (Tenn.1976); *State v. Hicks,* 618 S.W.2d 510 (Tenn.Crim. App.1981); and *Shockley v. State,* 585 S.W.2d 645 (Tenn.Crim.App.1978). *See generally,* Raybin, *supra,* at § 29.23, *et seq.*[6]

The Supreme Court has suggested that offending argument should be the subject of disciplinary action against the lawyer. *See United States v. Hasting,* 461 U.S. 499, 506 n. 5, 103 S.Ct. 1974, 1979 n. 5, 76 L.Ed.2d 96 (1983). Still another court has suggested that disciplinary action would be far more effective than "the disapproving remarks in a score of appellate opinions." *United States v. Modica,* 663 F.2d 1173, 1185 and 1185 n. 9 (2d Cir.1981). Suffice it to say that a lawyer is mistaken if he or she thinks that improper argument will not threaten the conviction or judgment or result in disciplinary sanctions against the offending lawyer.[7]

5. *THE COMPLETENESS OF THE TRIAL JUDGE'S INSTRUCTIONS*

The appellant complains that even though evidence was introduced at trial that the defendant had a blood alcohol level of .02% more than three (3) hours after the collision and a level of between .04% and .07% at the time of the accident, the trial judge failed to instruct the jury on how to consider this evidence. The trial judge did not instruct

---

6. The Trial Judge continues to have primary responsibility to see that final argument conforms to appropriate standards. *See United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) and *Burlison v. State,* 501 S.W.2d 801, 806 (Tenn.1973).

7. We suggest that the prosecutor in this case carefully read *United States v. Young, supra; Judge v. State, supra; United States v. Modica, supra;* and ABA Standard—Prosecution Function, 5.8. There should be no repeat of this type of argument.

the jury as to inferences in T.C.A. § 55–10–408.[8]

The appellant concedes in his brief that this alleged error was not "called to the trial judge's attention at trial or contained in the motion for new trial and normally [this issue] would be considered waived for appellate purposes." (Appellant Brief at p. 29).

Appellant is correct. In the absence of an objection or a special request, a defendant may not later raise an issue regarding an omission in the court's charge. *State v. Reece,* 637 S.W.2d 858, 861 (Tenn. 1982) and *State v. Blackwood,* 713 S.W.2d 677 (Tenn.Crim.App.1986). An objection or special request is required to challenge an inadequate, as opposed to an inaccurate, jury instruction. *State v. Reece, supra* at 861 and *State v. Hardin,* 691 S.W.2d 578 (Tenn.Crim. App.1985).

The omission here is not plain error as insisted by the appellant. The proof was that if the State had not called the expert on intoxication, then the defense wanted to call him. The expert testified in answer to a question by the defense counsel that the legal inference of intoxication was .10% and then he explained that there would only be driving impairment above .05%. The range of blood alcohol measurements was discussed in detail by the witness in response to a series of questions by defense counsel. In closing argument, the prosecutor spent very little of her argument discussing the defendant's alcohol use (12 lines of transcript) and defense counsel also only discussed it briefly (24 lines of transcript). In the absence of a special request or an objection, the trial judge did not commit error by his failure to instruct the provisions of T.C.A. § 55–10–408.

### 6. FAILURE TO INSTRUCT ON VEHICULAR ASSAULT (T.C.A. § 39–13–106)

Here again appellant concedes that he made no request for this instruction, did not object to its omission from the charge, and did not raise it in his motion for a new

trial. The court need not discuss the waiver issue, however, as the simple answer is that T.C.A. § 39–13–106 is not a lesser included offense of reckless aggravated assault. (T.C.A. § 39–13–102). T.C.A. § 39–13–106 is vehicular assault as a proximate result of intoxication. The indictment in this case does not allege intoxication, and therefore, T.C.A. § 39–13–106 is not a lesser included offense of T.C.A. § 39–13–102. *See Howard v. State,* 578 S.W.2d 83 (Tenn.1979).

### 7. THE LENGTH OF THE SENTENCE

Appellant first submits that it was error to impose the maximum sentence on each of his two offenses.

In reviewing a sentence, this Court conducts a *de novo* review of the record with a presumption that the determinations made by the trial court are correct. T.C.A. § 40–35–401(d). This review requires a consideration of the following: the evidence received at the trial and sentencing hearing; the presentence report; the principles of sentencing; the arguments of counsel as to sentencing alternatives; the nature and characteristics of the offense; any mitigating and/or enhancement factors; statements made by the offender; and the offender's potential for rehabilitation. T.C.A. §§ 40–35–103 and 210.

In sentencing the defendant, the trial court found no mitigating factors and six (6) enhancement factors. The enhancement factors found by the trial court were that the defendant had a previous history of criminal convictions or criminal behavior (T.C.A. § 40–35–114(1)); the offense involved more than one victim (T.C.A. § 40–35–114(3)); the personal injuries inflicted upon the victim were particularly great (T.C.A. § 40–35–114(6); the defendant possessed or employed a deadly weapon during the commission of the offense (T.C.A. § 40–35–114(9)); the defendant had no hesitation about committing a crime when the risk to human life was high (T.C.A. § 40–35–114(10)); and the crime was committed under circumstances under which

---

**8.** A reading of .10 percent alcohol in the blood or more creates an inference of intoxication. A reading of .05 or less creates no inference.

potential for bodily injury to the victim was great (T.C.A. § 40–35–114(16)).

In addition to the above, the trial judge noted that the defendant had "an obvious attitude" and an attitude of "one who simply believes he has done no wrong on any of the offenses he has ever been arrested on. It's always somebody else's fault."

The record indicates that the defendant does have prior criminal convictions for driving under the influence, disturbing the peace, and criminal trespass. The trial court even noted that the defendant had only been released from probation eight days prior to the present offense. Thus, the trial court properly found this aggravating circumstance.

The defendant argues that the trial court erred in finding that the offense involved more than one victim because he received consecutive sentences for the separate offenses. The defendant relies on the case of *State v. Lambert,* 741 S.W.2d 127, 134 (Tenn. Crim.App.1987), in support of his argument. However, the present case is distinguishable. In the *Lambert* case, the defendant received separate convictions for separate offenses, thus, this Court found that this aggravating circumstance did not apply. *Id.* at 134.

However, in the present case, while the defendant did receive two separate convictions for aggravated assault, there were a total of four victims. The passengers in the back seat of the car were also injured when the defendant committed the present offenses.

The Court believes that the trial judge properly applied T.C.A. § 40–35–114(9) to this case.

The Court agrees with the appellant that the remaining enhancement factors are not appropriate as they involve essential elements of a vehicular aggravated assault involving serious bodily injury founded on recklessness. T.C.A. § 40–35–114.

This Court finds that the circumstances set forth in T.C.A. § 40–35–114(1), (3) and (9) are present. Since there are no mitigating factors, the trial judge appropriately set the sentence above the minimum. T.C.A. § 40–35–210(d).

In this case, given the appropriate weight to the three (3) appropriate enhancement factors, we find no error in the setting of the sentences at six (6) years. *Cf. State v. Lambert, supra* at 134.

## 8. *CONSECUTIVE SENTENCING*

Lastly, appellant contends that the trial court erred in imposing consecutive sentencing. The court ordered appellant to serve his sentences consecutively upon finding him to be a "dangerous offender." T.C.A. § 40–35–115(b)(4). A dangerous offender is one "whose behavior indicates little or no regard for human life, and no hesitation about committing a crime to which the risk to human life is high." T.C.A. § 40–35–115(b)(4).

Recently, this court explained when consecutive sentencing may be imposed on the ground that a defendant is a dangerous offender. The record must establish the following:

(a) the defendant's behavior indicates "little or no regard for human life," and he did not hesitate "about committing a crime in which the risk to human life is high," T.C.A. § 40–35–115(b)(4) (Supp.1989);

(b) the circumstances surrounding the commission of the offense are aggravated, *Gray v. State,* 538 S.W.2d [391] at 393 [ (Tenn.1976) ];

(c) confinement for an extended period of time is necessary to protect society from the defendant's unwillingness to "lead a productive life and [his] resort to criminal activity in furtherance of [his] anti-societal lifestyle," *Gray v. State,* 538 S.W.2d at 393; and

(d) the aggregate length of the sentences, if consecutive sentencing is ordered, reasonably relates to the offenses of which the defendant stands convicted. *State v. Taylor,* 739 S.W.2d [227] at 230 [ (Tenn.1987) ].

*State v. Woods,* 814 S.W.2d 378, 380 (Tenn. Crim.App.1991).

In view of the criteria set forth in *Woods,* we respectfully find that the trial court erred in ordering the appellant to serve his sentences consecutively. At least two of the *Woods* criteria have not been met.

The defendant is young, his family is supportive, and he was the recipient of a number of reference letters as noted by the trial judge. Since the offense, the defendant has remained employed and is a successful student at Memphis State University. He seems now willing to make the effort to lead a productive life and he certainly had the capabilities necessary to rehabilitate himself.

We further find the sentences imposed by the court, of which appellant received the maximum in his range, adequate to punish him for the offenses for which he stands convicted. We are ever so mindful of the tragedy that occurred in this case. We are also mindful that our sentencing laws in Tennessee were designed to assure fair, consistent treatment of all defendants by eliminating unjustified disparity in sentencing. It is true that in a case like this, emotions run high; and the standards are often pressured to change as deserved retribution to the egregious offender. This court must resist this human tendency to change the rules, statutes, and case law depending on the emotional aspects of the case under review.[9]

Appellant's convictions and sentences are affirmed except as to the consecutive sentencing. Appellant's sentences will be served concurrently, and this judgment is affirmed as amended.

SCOTT, P.J., and WHITE, J., concur.

---

**9.** This paragraph is paraphrased from a recent decision by Judge Paul Summers in *State v. Ange-* *la Young*, Court of Criminal Appeals, unreported, 1993 WL 56586, (March 4, 1993).