# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 10, 2002 Session

## STATE OF TENNESSEE v. EDWARD COLEMAN AND SEAN WILLIAMS

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 99-11607, 99-11608     Joseph B. Dailey, Judge**

---

**No. W2001-01021-CCA-R3-CD - Filed November 7, 2002**

---

A Shelby County jury convicted the defendants, Edward Coleman and Sean Williams, of premeditated murder, felony murder, especially aggravated kidnapping, and aggravated kidnapping. The trial court merged the two murder convictions and sentenced the defendants to life. The trial court merged the kidnapping convictions and sentenced Coleman and Williams to twenty-two years and eighteen years, respectively, to be served consecutively to the life sentence. In this appeal of right, both defendants raise the following issues: (1) whether the evidence was sufficient to support the convictions; (2) whether the trial court erred in denying the defendants' motion to sever; (3) whether the state failed to provide the defendants with timely discovery; and (4) whether the trial court erred in permitting testimony that Williams shot a witness in this case on a prior occasion. In addition, Coleman raises the following issues: (1) whether the trial court erred in permitting testimony regarding the loss of Coleman's leg, allegedly caused by the victim; and (2) whether the state knowingly presented perjured and conflicting testimony. Williams also raises the following issues: (1) whether the trial court erred in admitting photographs of the victim's body; and (2) whether the state during closing argument violated the Bruton rule by referring to Coleman's incriminating statement regarding Williams. After reviewing the record, we affirm the convictions for premeditated first degree murder but reverse and dismiss the other charges based upon insufficiency of the evidence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part;**
**Reversed and Dismissed in Part**

JOE G. RILEY, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and DAVID G. HAYES, JJ., joined.

C. Anne Tipton, Memphis, Tennessee, for the appellant, Edward Coleman.

Mark Mesler (on appeal) and Howard Manis (at trial), Memphis, Tennessee, for the appellant, Sean Williams.

Paul G. Summers, Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; William L. Gibbons, District Attorney General; and Stephen P. Jones and Amy P. Weirich, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

Orlando Gates, the sixteen-year-old victim, died from multiple gunshot wounds inflicted on January 11, 1999. In 1998, Gates and the defendant, Edward Coleman, were involved in an automobile accident, in which Coleman lost one of his legs. Sid Rhodes, a co-defendant, testified that while he was visiting Coleman in the hospital following the accident, Coleman said, "I'm going to kill him," referring to Gates. Ocassieo Johnson, a friend of the defendants, testified Coleman once said he wanted to get someone to "jump" Gates. Johnson also testified the defendant, Sean Williams, once said he wanted to shoot Gates due to the injury to Coleman's leg.

Around 8:00 p.m. on January 11, 1999, Williams picked up Coleman, Rhodes, and Mario Means in a stolen Nissan Altima. Coleman removed a .25 automatic pistol from the trunk of the car. Both Johnson and George Gates, the victim's brother, testified they saw Coleman with the gun earlier in the day. Rhodes testified that when they entered the car, Williams asked, "Do you know what we fixin' to do?" When Rhodes indicated he did not know, Williams answered, "We fixin' to kill him." When Rhodes asked who they intended to kill, Williams answered, "Orlando Gates."

Williams, Coleman, Rhodes, and Means then went to Williams' house, and Williams asked Rhodes to get the victim, who was inside the house. When Rhodes knocked on the door, Gates came out of the house. Gates got into the car, and Rhodes went inside Williams' house. Gates then came back inside Williams' house and told Rhodes "Come on, we're leaving." Rhodes then got into the car with Williams, Coleman, Means, and Gates.

Means testified that while Rhodes was inside Williams' house, Williams and Coleman began to whisper to each other. Williams asked, "Do they know what we fixin' to do?" Coleman said, "No." Williams then asked, "Do they know we fixin' to kill him?" Williams and Coleman then laughed.

Williams was driving the Altima, and Coleman sat in the front passenger seat. Rhodes, Means, and Gates sat in the back seat with Gates sitting between Rhodes and Means. Williams drove to the "waterfall," an isolated, wooded area at the south end of Prospect Street in Memphis.

When they arrived at the "waterfall," Williams pulled the car into a ditch and told everyone to get out because the car was stuck. Rhodes and Means testified they all tried to push the car, but Williams had his foot on the brake. Means told Williams to get his foot off the brake, and when he did, they pushed the car up the hill.

Rhodes testified that Coleman then cocked his pistol and fired three shots at Gates, who fell to the ground. Rhodes testified Williams took the gun from Coleman and shot Gates in the head, and Gates stopped moving.

Rhodes and Means testified that after Williams shot the victim, he told them to shoot Gates, and if they did not, he would kill them. Rhodes testified Williams gave the gun to Means, who shot the gun once toward Gates. Rhodes testified that after Means shot the gun, Means gave it to Rhodes, who fired two shots beside Gates' body. Coleman said Gates was not dead, so Williams took the gun from Rhodes and shot Gates once more in the head. Acting upon Coleman's instructions, Williams hid the victim's body in the bushes.

Means, however, testified Coleman first shot Gates several times. Williams then took the gun and threatened Means and Rhodes with it. Means further testified he took the gun, held it behind his back, and shot the gun once without hitting Gates. Williams and Coleman laughed at Means for missing Gates, and Means ran back to the car. Means testified Williams then shot Gates twice in the head, but Rhodes never shot Gates. When Williams got into the car, Means asked him if he shot Gates in the head. Williams responded, "Where you think I shot him at, his ear?"

Coleman, Williams, Means, and Rhodes then drove to Williams' house. Johnson testified he saw the Altima coming down Prospect Street, but because the windows were tinted, he could not see who was inside the car. Johnson followed the car to a parking lot near Williams' house. While standing in the front yard, Williams' mother yelled, "If I go up there and anything is wrong with that boy, everybody that was in the car is going to jail." Coleman then told Johnson to take the car out of the neighborhood, so Johnson left with the car. Means went home and Coleman, Williams, and Rhodes went inside Williams' house. Rhodes testified Williams' mother asked, "Why you do it?"; no one responded.

Tiffany Pride, a neighbor, testified Williams came to her house on the night of January 11th looking for his grandmother. She testified Williams looked scared and had spots of blood on his clothes. She said she overheard Williams tell his grandmother he needed her to wash some of his clothes.

Johnson testified he called Coleman on January 12th, and Coleman said he shot Gates at the "waterfall" the previous day.

Rhodes and Means were charged with facilitation of first degree murder and were not tried with Coleman and Williams. A jury found Coleman and Williams guilty of premeditated murder, murder in perpetration of kidnapping, especially aggravated kidnapping, and aggravated kidnapping. The trial court merged the premeditated first degree murders and felony murders into a single conviction and further merged the especially aggravated kidnapping convictions and aggravated kidnapping convictions into a single conviction.

**SUFFICIENCY**

The defendants argue the evidence was insufficient to support the convictions. In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). A jury verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). On appeal, the state is entitled to the strongest legitimate view of the evidence and all legitimate or reasonable inferences which may be drawn therefrom. *Id.* This court will not disturb a verdict of guilt due to the sufficiency of the evidence unless the defendant demonstrates that the facts contained in the record and the inferences which may be drawn therefrom are insufficient, as a matter of law, for a rational trier of fact to find the accused guilty beyond a reasonable doubt. State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996). Accordingly, it is the appellate court's duty to affirm the conviction if the evidence, viewed under these standards, was sufficient for any rational trier of fact to have found the essential elements of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994).

## A. Premeditated Murder

The applicable definition of first degree murder is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation necessitates "a previously formed design or intent to kill," State v. West, 844 S.W.2d 144, 147 (Tenn. 1992) (citations omitted), and "an act done after the exercise of reflection and judgment . . . [meaning] that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). It also requires that the accused be "sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

The element of premeditation is a question of fact to be determined by the jury. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Our supreme court delineated several circumstances that may be indicative of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations of the intent to kill the victim by the defendant, the making of preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. Bland, 958 S.W.2d at 660.

### 1. Premeditation

In the present case, the defendants made several declarations of their intent to kill the victim. Prior to the victim's death, Coleman stated he was "going to kill him," and he wanted someone to "jump" the victim. Williams stated he wanted to shoot the victim for what he did to Coleman's leg. While waiting on Gates to enter the car, Williams told Rhodes and Means they were "fixin' to kill" the victim.

The proof showed the defendants also made preparations prior to shooting the victim. First, Coleman obtained a .25 automatic pistol, and Williams obtained a stolen car. They drove the victim to a remote area and pretended the car was stuck in order to get the victim out of the car so they could shoot him. The victim was unarmed and defenseless.

Finally, the defendants were calm immediately after shooting the victim. They laughed when Means shot the gun and missed the victim's body. After killing the victim, Williams, acting upon Coleman's instructions, hid the victim in the bushes. When Johnson retrieved the Altima, Coleman told him to take it out of the neighborhood.

We conclude there was ample proof the defendants' actions were premeditated and intentional; the evidence supports the convictions for premeditated first degree murder.

### 2. Corroborating Evidence

The defendants contend the prosecution failed to present sufficient corroborating evidence of the accomplices' testimony to support a conviction. We disagree.

In Tennessee a conviction may not be based solely upon the uncorroborated testimony of an accomplice. State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001); State v. Allen, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). Furthermore, accomplices cannot corroborate each other. State v. Boxley, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001). However, corroboration is sufficient even though the evidence is slight and entitled, when standing alone, to but little consideration. State v. Caldwell, 977 S.W.2d 110, 116 (Tenn. Crim. App. 1997). The issue of whether an accomplice's testimony has been sufficiently corroborated becomes a matter entrusted to the jury, as the trier of fact. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994).

The prosecution presented sufficient evidence corroborating the testimony of Rhodes and Means, who identified the defendants as the perpetrators. Prior to the shooting, both Coleman and Williams made several statements to Johnson declaring their intent to kill the victim. In addition, Pride testified that later that night, Williams had spots of blood on his clothing, and he looked frightened. Finally, Johnson testified Coleman admitted to shooting the victim. After reviewing the record, we conclude this corroborating evidence was sufficient to support the convictions for premeditated murder.

## B. Murder in Perpetration of Kidnapping

Our statute defines first degree murder, in part, as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . kidnapping . . . ." Tenn. Code Ann. § 39-13-202(a)(2). The code further states "[n]o culpable mental state is required . . . except the intent to commit the enumerated offenses or acts . . . ." *Id*. at (b). Additionally, the death must occur "in the perpetration of " the enumerated felony. State v. Hinton, 42 S.W.3d 113, 119 (Tenn. Crim. App. 2000) (citations omitted).

As applicable to the present case, "kidnapping" is defined as "false imprisonment...[u]nder circumstances exposing the other person to substantial risk of bodily injury . . . ." Tenn. Code Ann. § 39-13-303(a)(1). "False imprisonment" is committed when one "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a). Unlawful removal or confinement may be accomplished through either "force, threat, or *fraud* . . . ." Tenn. Code Ann. § 39-13-301(2) (emphasis added).

The defendants contend the evidence was insufficient to support the convictions for murder in perpetration of a kidnapping because the victim was not unlawfully removed or confined. The state argues the victim was removed and confined by "fraud." We agree with the defendants.

We have examined the state's argument to the trial court in response to the defendants' motion for judgment of acquittal with regard to the alleged kidnapping. The defendants argued the victim voluntarily got into the car, voluntarily got out of the car, and was shot moments later, which would not constitute kidnapping. The state argued the victim may well have gotten into the car and gone to the scene voluntarily, but the kidnapping occurred at the point when the victim got out of the car because of the defendants' ploy that the car was stuck.

In final argument, the state contended the victim got into the car voluntarily, but he would not have done so if he had known what was about to occur. The state further argued that when the defendants took the victim to the "waterfall," he was not going home, but rather was removed or confined by the defendants.

On appeal, the state contends the victim was "fraudulently induced" to get into the vehicle and go to the scene of his murder. The state has changed theories from the trial court to the appellate court. *See* State v. Alder, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001) (holding issue is waived when a party changes theories). Regardless, we conclude the evidence does not support the convictions for felony murder.

As stated, our kidnapping statutes provide that the unlawful removal or confinement may be accomplished not only by "force" or "threat," but also by "fraud." Tenn. Code Ann. § 39-13-301(2).

> The use of fraud as a substitute for force in effecting kidnapping implies false and fraudulent representations amounting substantially to a coercion of the will of the kidnapped person. In determining whether the person was coerced by fraud and inveiglement, the nature of the artifice employed and the age, education, and condition of mind must be taken into consideration, and ordinarily a false statement or representation is not of itself sufficient to constitute fraud.

51 C.J.S. *Kidnapping* § 1, p. 498 (1967).  Here, we are unable to conclude that the defendants themselves, or through others, made false and fraudulent representations in order to entice the victim to get into the car.

The state relies upon the case of State v. John Charles Johnson in contending the defendants unlawfully removed and confined the victim through "fraud."    No. M2000-00529-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 193 (Tenn. Crim. App. March 1, 2001, at Nashville), *perm. to app. denied* (Tenn. July 9, 2001).  In Johnson, the defendant and the co-defendant fabricated a story in order to lure the victim to a secluded area where they would kill him. *Id*. at *4.  After obtaining a gun, they went to the victim's house and told him people who were interested in selling a stolen car were waiting for them at a lake. *Id*. at *5.  They told the victim to come with them if he was interested, and the victim agreed. *Id*.  The defendant drove them to the lake where he then killed the victim. *Id*. at **5-6.  This court held the defendant "knowingly and unlawfully removed [the victim] from his home by fraud." *Id*. at *34.

Although we do not disagree with the holding in Johnson, its facts are distinguishable from the case at bar.  In support of its argument, the state relies upon the following testimony of Rhodes:

> Q: You're all in the car, what happened?  What happened next?
> A: We left and went around to Sean Williams' house.  He said, 'Go knock on the door and tell Orlando to come on'. . . .
> Q: —What happened?
> A: He come out—Orlando comes out the house.  I goes in the house.  Orlando gets in the car.  And I was in Sean's living room.  I come back and look out the door.  They were backing out.  And, Sean Williams—Orlando opened the door and said, 'Come on, Manie Manie [Rhodes].'  So I jumped in the car.

After reviewing the record, we are unable to conclude the victim was fraudulently induced to get into the car.  We agree the evidence established the defendants' previously formed intent to murder the victim and further agree with the state's argument that the victim would not have voluntarily gotten into the car had he known he would be killed; however, we do not believe this constitutes fraud as contemplated by the statute.  In addition, the record does not reveal what, if anything, the defendants previously told the victim about where they were going.  We are unable to speculate on such matters.  We only know from the record that defendant Williams told Rhodes to tell the victim to "come on," and the victim voluntarily got into the car.  Under these circumstances, we are unable to conclude the victim was removed or confined by fraud.

We recognize that removal or confinement may initially be with the consent of a victim, yet subsequently become unlawful and against the will of a victim. *See* State v. Davis, 656 S.W.2d 406, 409 (Tenn. Crim. App. 1983).  However, the record in this case does not show the victim ever tried to leave the car or presence of the defendants and was prohibited from doing so.  Thus, there was no showing he was confined against his will prior to being shot.

We, therefore, hold that the evidence was insufficient to support the convictions for felony murder.[1]

## C. Especially Aggravated Kidnapping and Aggravated Kidnapping

The jury convicted the defendants of especially aggravated kidnapping and aggravated kidnapping. The trial court merged the aggravated kidnapping convictions into the especially aggravated kidnapping convictions.

As applicable to this case, especially aggravated kidnapping is "false imprisonment...[w]here the victim suffers serious bodily injury." Tenn. Code Ann. §§ 39-13-302(a), -305(a)(4). As discussed above, the evidence does not support kidnapping. Accordingly, the convictions for especially aggravated kidnapping and aggravated kidnapping are reversed, and these charges are dismissed.

### MOTION FOR SEVERANCE OF DEFENDANTS

Prior to trial, the trial court denied the defendants' motions for severance. The defendants argue they were unduly prejudiced by the denial. We disagree.

Tennessee Rule of Criminal Procedure 14(c)(1) addresses a Bruton problem. In a joint trial, the admission of a co-defendant's confession implicating the defendant, which would be inadmissible against the defendant if tried alone, creates a "substantial risk" that the jury will consider the confession in determining the defendant's guilt. Bruton v. United States, 391 U.S. 123, 126, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). If a defendant moves for severance based upon a Bruton problem, the trial court shall first determine whether the prosecution intends to offer the confession into evidence at trial. Tenn. R. Crim. P. 14(c)(1). If the state intends to do so, the court shall require the state to elect among several options. *Id*. First, the state may elect to hold a joint trial where the court would not admit the statement into evidence or where the statement would not be error if admitted. *Id*. at (c)(1)(i). Second, the state may elect to hold a joint trial where the court would admit the statement into evidence after redacting all references to the moving defendant, if the redacted confession would not prejudice the defendant. *Id*. at (c)(1)(ii); *see* Denton v. State, 945 S.W.2d 793, 801-02 (Tenn. Crim. App. 1996) (noting court cannot redact a statement "'in fairness'"

---

[1] Prior to 1989, confinement was unlawful if it was "induced by force, threat or *deception*." Tenn. Code Ann. § 39-2-301(b)(3) (1982) (emphasis added). However, at present, removal or confinement is unlawful if "accomplished by force, threat or *fraud*." Tenn. Code Ann. § 39-13-301(2) (1997) (emphasis added). Although the trial court's jury charge correctly stated the elements of "force, threat or *fraud*," the word "fraud" was not defined. *See* Tenn. Code Ann. 39-11-106(a)(13) (1997). Instead, the jury instruction defined the word "deception," which was not charged as an element of the offense. The trial court defined "deception" as "the act of deceiving; intentional misleading by falsehood spoken or acted." This definition came from a previous edition of the pattern charge, *see* T.P.I.-CRIM. 8.03 (4th ed. 1995), and is not included in the current pattern charge, *see* T.P.I.-CRIM. 8.03 (5th ed. 2000). Regardless, we conclude the evidence does not support a finding of "fraud" with regard to the victim's removal or confinement.

if the redaction "alters its substance or deletes therefrom substantially exculpatory information"). Finally, the state may elect to sever the moving defendant. Tenn. R. Crim. P. 14(c)(1)(iii).

Tennessee Rule of Criminal Procedure 14(c)(2) provides that the trial court shall sever the defendants under the appropriate circumstances upon a motion by either the state or the defendant. The court shall sever the defendants before trial if such a severance is "necessary to protect a defendant's right to a speedy trial" or is "appropriate to promote a fair determination of the guilt or innocence of one or more defendants . . . ." *Id.* at (c)(2)(i). A trial court shall grant a severance during trial if it is "necessary to achieve a fair determination" of a defendant's guilt or innocence. *Id.* at (c)(2)(ii). However, in order to grant a severance during trial, the court must have the consent of the defendant to be severed. *Id.*

The decision as to whether or not to grant a severance is left to the sound discretion of the trial judge, and this decision will not be disturbed unless the defendant is unfairly or unduly prejudiced. *See* State v. Coleman, 619 S.W.2d 112, 116 (Tenn. 1981); State v. Woods, 806 S.W.2d 205, 211 (Tenn. Crim. App. 1990). Stated in another manner, a trial court will not be found to have abused its discretion in denying a severance unless "'the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty.'" State v. Burton, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988) (quoting Hunter v. State, 440 S.W.2d 1, 6 (Tenn. 1969)).

## A.  Defendant Coleman

Coleman contends the trial court erred in denying his motion for severance because Johnson's testimony that Williams said he wanted to shoot the victim due to the injury to Coleman's leg would have been inadmissible against Coleman. Coleman contends this statement was the only evidence of motive, and he was unduly prejudiced by its admission. We disagree.

Firstly, Johnson's challenged testimony only implicated Williams, not Coleman; therefore, there is no Bruton problem. Furthermore, Williams' statement was not the only evidence of "motive" presented at trial. Both Johnson and Rhodes testified that Coleman stated he wanted to "kill" the victim and wanted someone to "jump" the victim because of the injury to his leg. Regardless of the admissibility of this evidence as it relates to Coleman, this evidence did not unduly prejudice Coleman in light of the other evidence presented at trial.

Coleman also contends that Means' testimony as to the reason he was frightened of Williams was inadmissible against him and resulted in undue prejudice. Means testified he took seriously Williams' threats to kill him if he did not shoot the victim because in 1997 or 1998, Williams shot Means in his shoulder during an argument. Testimony as to this prior incident does not implicate Coleman in any way. Only when examined with other evidence presented at trial does it shed a negative light upon Coleman. *See* Richardson v. Marsh, 481 U.S. 200, 208-09, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987). Therefore, we conclude the trial court's denial of severance did not unduly prejudice Coleman.

**B. Defendant Williams**

Johnson testified he called Coleman the day after the shooting, and Coleman stated he shot the victim. Prior to Johnson's testimony, the trial court redacted portions of the conversation in which Coleman stated he *and Williams* shot the victim. The trial court also instructed the jury that "[a]ny evidence which was limited to a particular defendant should not be considered by you as to the other defendant."

As noted above, if a defendant moves for a severance based upon a co-defendant's confession, the trial court may instead choose to redact all references to the defendant and admit the confession if it will not prejudice the defendant. Tenn. R. Crim. P. 14(c)(1)(ii). A Bruton problem is generally not created when a trial court redacts any references to the defendant from a co-defendant's confession, and other evidence implicates the defendant. *See* Richardson, 481 U.S. at 208.

Coleman did not testify at trial. Williams contends the redaction of Coleman's confession was insufficient to protect him from the dangers expressed in Bruton. However, Coleman's redacted confession does not implicate Williams on its face. Only by considering other evidence could the jury conclude Williams participated in the shooting with Coleman. The redaction of Coleman's confession by the trial court sufficiently protected Williams from the risks expressed in Bruton.

The trial court did not abuse its discretion in denying the defendants' motions for severance.

## DISCOVERY VIOLATION

Both defendants allege they were prejudiced by the state's untimely revelation of an oral statement made by defendant Williams to law enforcement officers. The revelation was made on the original trial date, and the trial court granted a 30-day continuance due to this late revelation.

Defendant Williams contends the untimely revelation was excessive and inexcusable. Defendant Coleman contends the discovery violation prevented the trial court from considering Williams' statement to the police when ruling on Coleman's pre-trial motion for severance.

The record reflects both the motion for a continuance and the motion to suppress the statement were argued, but neither was transcribed. It is the duty of the accused to provide a record which conveys a fair, accurate and complete account of what transpired with regard to the issues which form the basis of the appeal. Tenn. R. App. P. 24(b); *see* State v. Taylor, 992 S.W.2d 941, 944 (Tenn. 1999). Because the defendants have failed to provide a complete record as to the relevant events, this issue is waived. Furthermore, we note the trial court granted a 30-day continuance. Neither defendant has demonstrated any prejudice. The issue is without merit.

## PRIOR BAD ACTS

Means testified he believed Williams' threats to kill him and Rhodes if they did not shoot the victim because Williams once shot him in the shoulder during an argument. Coleman argues the testimony is irrelevant and hearsay as offered against him. Williams contends the testimony violates Tennessee Rule of Evidence 404(b) as evidence of a prior bad act in that no material issue relevant to this testimony exists, and its probative value is outweighed by its prejudicial effect.

The prosecution filed a notice of intent to use this evidence at trial. The defendants filed a motion in limine to exclude the evidence. Motions in limine were heard by the trial court, but they were not transcribed in the record. Therefore, this issue has been waived. Furthermore, based upon the limited record before us, we are unable to conclude the trial court erred in admitting this evidence.

## TESTIMONY REGARDING THE LOSS OF COLEMAN'S LEG

Coleman contends the trial court erred in admitting testimony regarding the loss of his leg. Coleman maintains the evidence is irrelevant, and its probative value is substantially outweighed by its prejudicial effect. Coleman also argues Williams' statement that he wanted to shoot the victim due to the injury to Coleman's leg is inadmissible hearsay as offered against him.

### A. Relevance

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Once the court concludes the evidence is relevant, the court should exclude the evidence if its probative value is substantially outweighed by its prejudicial effect. Tenn. R. Evid. 403; State v. James, 81 S.W.3d 751, 757 (Tenn. 2002). A trial court's decision as to the relevance of evidence under Rule 401 will be reversed only upon a showing of abuse of discretion. State v. Dubose, 953 S.W.2d 649, 652 (Tenn. 1997).

In the present case, the evidence regarding the loss of Coleman's leg is relevant to motive. The defendants' statements in which they blame the victim for Coleman's injury also rebut their contention that they were good friends with the victim. As a result, we conclude the trial court did not abuse its discretion in admitting this evidence.

### B. Hearsay

Johnson testified Williams said he wanted to shoot the victim because of the injury to Coleman's leg. This statement is admissible against Williams under the party-opponent admission exception to the hearsay rule. *See* Tenn. R. Evid. 803(1.2).

Defendant Coleman argues this statement by Williams was inadmissible hearsay as it relates to him. However, this statement did not implicate Coleman and, thus, was not admitted against Coleman; it was admitted only as to Williams. As previously stated, the trial court instructed the jury that evidence limited to a particular defendant should not be considered against the other defendant. Furthermore, the record does not reveal any objection by Coleman to this evidence. *See* State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000) (noting the failure to make a contemporaneous objection to testimony waives the issue). In addition, Johnson also testified Coleman said he wanted to get someone to "jump" the victim, and Rhodes testified Coleman said he was "going to kill" the victim. Coleman was not prejudiced by the introduction of this evidence. This issue is without merit.


## PERJURED AND CONFLICTING TESTIMONY

Coleman maintains the prosecution knowingly presented perjured and conflicting testimony through witnesses Rhodes and Means, which warrants a reversal. We disagree.

Knowingly presenting false evidence or failing to correct false testimony is incompatible with "rudimentary demands of justice." Giglio v. United States, 405 U.S. 150, 153, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972) (citations omitted). The nondisclosure of material evidence affecting the credibility of a witness may justify a new trial if the reliability of the witness is determinative of the guilt or innocence of the defendant. *Id*. at 154; *see* Irick v. State, 973 S.W.2d 643, 657 (Tenn. Crim. App. 1998) (noting the state must disclose evidence the defendant can use to impeach a witness). Plea agreements are considered evidence that affect the credibility of a witness. State v. Bolden, 979 S.W.2d 587, 590 (Tenn. 1998). In addition, if the false testimony could have reasonably affected the verdict, a new trial is required. Giglio, 405 U.S. at 154.

Coleman identifies two specific instances in which the prosecution's evidence allegedly conflicts. First, he alleges Rhodes and Means testified they had not received nor expected to receive reduced sentences in exchange for their testimony, while Detective Charles Scheel testified they were originally booked for first degree murder, which was reduced to facilitation of first degree murder after they gave their statements. Second, he alleges either Means or Rhodes committed perjury while on the stand because their testimony directly conflicts as to the events which occurred during the shooting.

Initially, we note Coleman has cited no authority to support his position. Thus, the issue is waived. Regardless, the argument is without merit. There is no showing in the record the witnesses testified falsely by stating they had "no deal with the state." Furthermore, even though there were conflicts in the testimony of the witnesses as to various details surrounding the shooting, the conflicts do not relate to the identity of the defendants as the perpetrators. Most importantly, we find nothing to suggest that the state engaged in deception by knowingly presenting false testimony. This issue is without merit.

-12-

## PHOTOGRAPHS

Defendant Williams maintains the trial court erred in admitting certain photographs into evidence. We disagree.

The admissibility of photographs lies within the sound discretion of the trial court whose ruling will not be overturned on appeal except upon a clear showing of an abuse of discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); State v. Lacy, 983 S.W.2d 686, 694 (Tenn. Crim. App. 1997). Nevertheless, the photograph must be relevant to an issue at trial with its probative value outweighing any prejudicial effect that it may have upon the trier of fact. State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993).

The first photograph in which Williams takes issue is Exhibit 3, a view of the victim's body as the police found it. The photograph shows the victim lying face down in a hole surrounded by bushes. The photograph is relevant to show the location and position of the body as it was found and to corroborate the testimony of Means and Rhodes. Means and Rhodes both testified Williams hid the victim's body in the bushes, which is consistent with the illustration in the photograph. Furthermore, the photograph has little prejudicial effect. The photograph does not show any blood or wounds and is not otherwise inflammatory. Therefore, the trial court did not err in admitting this photograph into evidence.

Williams also maintains the trial court erred in admitting Exhibit 17, which is a view of the victim's body facing upward. The photograph is relevant to illustrate the nature of the wounds and the brutality of the attack, although we consider its relevance marginal. The photograph does show some blood and the victim's wounds; however, it is not particularly inflammatory. This photograph is similar to another photograph entered without objection. The defendant was not prejudiced by the admission of this photograph into evidence.

## CLOSING ARGUMENTS

Williams contends the prosecution made improper remarks during closing argument by referring to Coleman's statement to Johnson, which included a reference to Williams that had been redacted by the trial court. He maintains the trial court erred by refusing to grant a mistrial.

If we conclude that the prosecutor's remarks constituted error, then we must determine whether that error prejudiced the defendant. This court has set out five factors which must be considered in making the determination of whether a prosecutor's improper conduct could have affected the verdict to the prejudice of the defendant. These factors are as follows:

1. the conduct complained of in light of the facts and circumstances of the case;

2.      the curative measures undertaken;

3.      the intent of the prosecutor in making the improper remarks;

4.      the cumulative effect of the improper conduct and any other errors in
        the record; and

5.      the relative strength or weakness of the case.

State v. Philpott, 882 S.W.2d 394, 408 (Tenn. Crim. App. 1994).

In addition, the reviewing court may consider whether the remarks were lengthy, repeated, single or isolated. State v. Norris, 874 S.W.2d 590, 599 (Tenn. Crim. App. 1993). Cases should be reversed only when the prosecutorial remarks "so inflict the trial with unfairness as to make the resulting convictions a denial of due process." *Id.* (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868, 1871, 40 L. Ed. 2d 431 (1974)).

During the state's rebuttal closing argument, the prosecutor referred to Coleman's telephone conversation with Johnson. The prosecutor stated Johnson testified he called Coleman the morning after the murder and said, "What's going on? We're hearing all this stuff on the street. Everybody is talking." The prosecutor then stated the following:

> I'll tell you what's going on—I'll tell you exactly what's going on
> Casieo, I had a big night last night—big night. I finally had
> everything in place to get my revenge on Orlando Gates. I had my
> big, bad buddy Sean Williams with me—

Defense counsel objected and moved for a mistrial, which the trial court denied. The prosecution, nevertheless, did not mention again that Coleman also referred to Williams in the conversation.

During closing arguments, the prosecutor acted out the telephone conversation between Johnson and Coleman, referring to a statement made by Coleman which implicated Williams. As previously described, during Johnson's testimony, the trial court determined the statement created a Bruton problem and redacted the statement to exclude the reference to Williams. The prosecutor improperly, though very briefly, referred to the portion of Coleman's conversation which implicated Williams.

Even though the prosecutor's remarks were improper, we conclude the remarks were harmless. The prosecutor made this reference once, ceased this type of portrayal of the telephone conversation once the defendant objected, and made no further mention of it. Furthermore, we are unable to attribute an evil intent to the prosecutor's isolated remark in this lengthy trial. In addition, the state presented extremely damning evidence at trial from which the jury could find Williams

-14-

guilty beyond a reasonable doubt.  This error did not "affect the judgment to the prejudice of the defendant."  Tenn. R. App. P. 36(b).

## CONCLUSION

For these reasons, we affirm the premeditated first degree murder conviction of each defendant and reverse and dismiss the other charges.

_____
JOE G. RILEY, JUDGE